THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (SBN 168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile: 858/794-1450
kah@weiserlawfirm.com

Attorneys for Plaintiff Robert Berg and
[Proposed] Lead Counsel

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ROBERT BERG, Derivatively on Behalf of INTUITIVE SURGICAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GARY GUTHART, MARSHALL L. MOHR, LONNIE M. SMITH, DAVID J. ROSA, MARK J. MELTZER, JEROME J. MCNAMARA, AUGUSTO V. CASTELLO, SALVATORE J. BROGNA, COLIN MORALES, CRAIG H. BARRATT, ERIC H. HALVORSON, AMAL M. JOHNSON, ALAN J. LEVY, FLOYD D. LOOP, MARK J. RUBASH and GEORGE STALK, JR., <br><br> Defendants, <br><br> – and – <br><br> INTUITIVE SURGICAL, INC., <br><br> Nominal Party. | Case No. 5:14-cv-00515-EJD <br><br> PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF <br><br> DATE:  July 11, 2014 <br> TIME:  9:00 a.m. <br> CTRM:  4 <br> JUDGE:  Hon. Edward J. Davila <br><br> Date Action Filed: 2/3/14 |

[Caption continued on next page.]

CITY OF BIRMINGHAM RELIEF AND )   Case No. 5:14-cv-01307-EJD
RETIREMENT SYSTEM, Individually and )
Derivatively on Behalf of Nominal Defendant )
INTUITIVE SURGICAL, INC., )   Date Action Filed: 3/21/14
 )
                        Plaintiff, )
 )
        vs. )
 )
GARY S. GUTHART, LONNIE M. SMITH, )
CRAIG H. BARRATT, PH.D., ERIC H. )
HALVORSON, AMAL M. JOHNSON, ALAN )
J. LEVY, PH.D., FLOYD D. LOOP, M.D., )
MARK J. RUBASH, GEORGE J. STALK, )
JR., and MARSHALL L. MOHR, )
 )
                        Defendants, )
 )
 – and – )
 )
INTUITIVE SURGICAL, INC., )
 )
                        Nominal Defendant. )
_____ )

PUBLIC SCHOOL TEACHERS' PENSION )   Case No. 3:14-cv-01384-LB
AND RETIREMENT FUND OF CHICAGO, )
 )
                        Plaintiff, )   Date Action Filed (State Court): 2/21/14
 )   Date Action Removed: 3/26/14
        vs. )
 )
GARY S. GUTHART, LONNIE M. SMITH, )
ERIC H. HALVORSON, ALAN J. LEVY, )
FLOYD D. LOOP, CRAIG H. BARRATT, )
AMAL M. JOHNSON, MARK J. RUBASH, )
GEORGE J. STALK, JR., MARSHALL M. )
MOHR, SALVATORE J. BROGNA, )
AUGUSTO V. CASTELLO, JEROME J. )
MCNAMARA, MARK MELTZER, COLIN )
MORALES and DAVID J. ROSA, )
 )
                        Defendants, )
 )
 – and – )
 )
INTUITIVE SURGICAL, INC., )
 )
                        Nominal Defendant. )
_____ )

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF ISSUES TO BE DECIDED .......................................................................2

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................2

I.      INTRODUCTION ........................................................................................................2

II.     FACTUAL BACKGROUND .......................................................................................6

III.    PROCEDURAL HISTORY.........................................................................................11

IV.     LEGAL ARGUMENT.................................................................................................11

        A.      Consolidation of the Actions ..........................................................................11

        B.      The Court Should Appoint the Weiser Firm as Lead Counsel ...........................13

                1.      Appointment of Lead Counsel is Necessary to Effectively
                        Prosecute the Consolidated Action ..................................................13

                2.      The Weiser Firm Should Be Appointed as Lead Counsel ........................13

                3.      Scott+Scott Should Not Be Appointed Lead Counsel ..............................17

                        a.      Scott+Scott's 220 Investigation Is Unpersuasive .........................17

                        b.      Scott+Scott's Client Monitoring Service Weighs Against
                                Them Being Appointed Lead Counsel...........................................20

V.      CONCLUSION............................................................................................................21

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ..................................................................................15

*Barry v. Cotsakos*,
    No. CIV419084 (Cal. Super. Ct., San Mateo Cnty.) ............................................15

*Belova v. Sharp*,
    No. CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008) .....................18, 19

*Conrad v. Blank*,
    940 A.2d 28 (Del. Ch. 2007)..............................................................................18

*Cook ex rel. Career Educ. Corp. v. McCullough*,
    11-CV-9119, 2012 WL 3488442 (N.D. Ill. Aug. 13, 2012) ................................19

*Cook v. Hewlett-Packard Co.*,
    No. 8667–VCG, 2014 WL 311111 (Del. Ch. Jan. 30, 2014) ...............................19

*David v. Wolfen, et al.*,
    No. 01-CC-03930 (Orange Cnty. Sup. Ct.) ..................................................14, 15

*Edmonds v. Getty*,
    No. 524 F. Supp. 2d 1267 (W.D. Wash. 2007)....................................................18

*Engel v. Sexton*,
    06-10447, 2009 WL 361108 (E.D. La. Feb. 11, 2009).................................18, 19

*Gebhardt v. Allumbaugh, et al.*,
    No. 2002-13602 (Tex. Dist. Ct., Harris Cnty.) .............................................14, 15

*Gregory v. Tuchman*,
    C.A. No. 3925-CC (Del. Ch.) .............................................................................16

*Horn v. Raines*,
    227 F.R.D. 1 (D.D.C. 2005)................................................................................12

*Ikerd v. Lapworth*,
    435 F.2d 197 (7th Cir. 1970) .............................................................................12

*In re Affymetrix Derivative Litig.*,
    No. C 06-05353 JW, 2008 WL 5050147 (N.D. Cal. Mar. 31, 2008) ....................18

*In re Citigroup, Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)............................................................................18

**Page**

*In re CNET Networks, Inc. S'holder Derivative Litig.*,
  No. C 06-03817 WHA, 2008 WL 2445200 (N.D. Cal. June 16, 2008)..................................19

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...........................................................................18

*In re Equity Funding Corp. of Am. Sec. Litig.*,
  416 F. Supp. 161 (C.D. Cal. 1976) ...................................................................................12

*In re Family Dollar, Inc., S'holder Derivative Litig.*,
  No. 06-CV-00510(W) (W.D.N.C.), In 2010...................................................................15

*In re Fannie Mae Derivative Litig.*,
  503 F. Supp. 2d 9 (D.C. Cir. 2008).................................................................................19

*In re Home Depot, Inc., Derivative Litig.*,
  No. 07-CV-0356-RLV (N.D. Ga.) .....................................................................................15

*In re HQ Sustainable Maritime Indus., Inc., Derivative Litig.*,
  826 F. Supp. 2d 1259 (W.D. Wash. 2011)..............................................................4, 18

*In re KB Home S'holder Derivative Litig.*,
  No. CV-06-05148-FMC(CTx) (C.D. Cal.) .....................................................................15

*In re KeyCorp Derivative Litig.*,
  No. 1:10-cv-01786-DAP (N.D. Ohio 2010) ..................................................................16

*In re Kosmos Energy Ltd.*,
  Civ. A. No. 3:12-CV-373-B, 2014 WL 1293834
  (N.D. Tex. Mar. 19, 2014) .....................................................................................5, 20, 21

*In re Oracle Corp. Derivative Litig.*,
  824 A.2d 917 (Del. Ch. 2003).....................................................................................14, 15

*In re Pfizer Inc. S'holder Derivative Litig.*,
  722 F. Supp. 2d 453 (S.D.N.Y. 2010)..........................................................................18, 19

*In re Prison Realty Sec. Litig.*,
  Civ. A. No. 3:99-0452 (M.D. Tenn.) ...........................................................................14, 15

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
  495 F. Supp. 2d 477 (D.N.J. 2007) ..............................................................................18, 19

*In re The Student Loan Corp. Derivative Litig.*,
  No. 17799, 2002 WL 75479 (Del. Ch. Jan. 8, 2002) .................................................18

*In re TASER Int'l S'holder Derivative Litig.*,
  No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. Mar. 17, 2006).................18, 19

**Page**

*In re Tyson Foods, Inc.*,
   919 A.2d 563 (Del. Ch. 2007)...........................................................................................18

*In re Veeco Instruments, Inc. Sec. Litig.*,
   434 F. Supp. 2d 267 (S.D.N.Y. 2006)...........................................................................18, 19

*In re Verifone Holdings, Inc. S'holder Derivative Litig.*,
   Nos. C 07-6347 MHP, C 07-6140 MHP, 2010 WL 3385055
   (N.D. Cal. Aug. 26, 2010)...........................................................................................19

*In re Zoran Corp. Derivative Litig.*,
   511 F. Supp. 2d 986 (N.D. Cal. 2007) .......................................................................4, 18

*Iron Workers Local No. 25 Pension Fund v. Credit Based Asset Serv. And Securitization, LLC*,
   616 F. Supp. 2d 461 (S.D.N.Y. 2009)...........................................................................21

*Kloss v. Kerker, et. al.*,
   Case No. 50 2010 CA 018594XXXXMB (Fla. Cir. Ct., 15th Jud. Cir., Palm Beach Cnty.) ..16

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936)...........................................................................................12

*Lester-Krebs, Inc. v. Geffen Records, Inc.*,
   No. 85 Civ. 6320, 1985 U.S. Dist. LEXIS 13201 (S.D.N.Y. Dec. 4, 1985)..........................12

*Lynch v. Rawls*,
   429 Fed. Appx. 641 (9th Cir. 2011)...........................................................................4, 18

*MacAlister v. Guterma*,
   263 F.2d 65 (2d Cir. 1958)...........................................................................................12, 13

*MCG Capital Corp. v. Maginn*,
   No. 4521-CC, 2010 WL 1782271 (Del. Ch. Mar. 3, 2010) ...........................................18

*Millman v. Brinkley*,
   No. 1:03-cv-3831-WSD, 2004 U.S. Dist. LEXIS 20113
   (N.D. Ga. Oct. 1, 2004)...........................................................................................13

*Pfeiffer v. Leedle*,
   No. 7381-VCP, 2013 WL 5988416 (Del. Ch. Nov. 8, 2013) ...........................................4, 18

*Pfeiffer v. Toll*,
   989 A.2d 683 (Del. Ch. 2010)...........................................................................................4, 18

*Pyott v. La. Mun. Police Emp. Ret. Sys.*,
   74 A.2d 612 (Del. 2013) ...........................................................................................4, 18

**Page**

*Ryan v. Gifford,*
918 A.2d 341 (Del. Ch. 2007)..............................................................4, 18

*Schriver v. Impac Mortgage Holdings, Inc.,*
No. SACV 06-31, 2006 U.S. Dist. LEXIS 40607
(C.D. Cal. May 1, 2006) ...........................................................................12

*Seinfeld v. Slager,*
No. 6462–VCG, 2012 WL 2501105 (Del. Ch. June 29, 2012)..............18

*Takeda v. Turbodyne Techs., Inc.,*
67 F. Supp. 2d 1129 (N.D. Cal. 1999) ...................................................12

*Travis v. Mittelstaedt, et al.,*
No. CV 06-2341, 2008 WL 755842 (E.D. Cal. Mar. 19, 2008) ............18

*Walker v. Deutsche Bank, AG,*
No. 04 Civ. 1921 (DAB), 2005 U.S. Dist. LEXIS 19776
(S.D.N.Y. Sept. 6, 2005)..........................................................................13

*Weiss v. Swanson,*
948 A.2d 433 (Del. Ch. 2008).................................................................18

**STATUTES, RULES AND REGULATIONS**

8 Del. C. §220 ..................................................................................2, 3, 17

Federal Rules of Civil Procedure
Rule 23.1 ....................................................................................................4
Rule 42 .........................................................................................1, 2, 12

Ohio Rev. Code Ann.
§1701.37......................................................................................................16

**SECONDARY AUTHORITIES**

Bruce Meyerson, *Shareholder Suits Means More Money For Lawyers, But Bring Governance Gains,* July 27, 2004 ...............................................................................14

Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* (2d ed. 1987)
§2385...........................................................................................................13

*Manual for Complex Litigation* (Fourth) (4d ed. 2004)
§10.22..........................................................................................................13

Suzanne Craig, *How One Firm Uses Strict Governance To Fix Its Troubles,* The Wall Street Journal, Aug. 21, 2003 .........................................................................15

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 11, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard, Plaintiff Robert Berg ("Berg"), will, and hereby does, move the Honorable Edward J. Davila, located in Courtroom 4, Fifth Floor, 280 South First Street, San Jose,  California 95113, for an order: (1) consolidating the above-captioned shareholder derivative actions (the "Actions"), currently pending in the Northern District of California on behalf of Nominal Defendant Intuitive Surgical, Inc. ("Intuitive" or the "Company"), and setting a procedure for the consolidation of any additional shareholder derivative actions hereinafter filed in this District that are related to such Actions; and (2) appointing The Weiser Law Firm, P.C. (the "Weiser Firm") as lead counsel (the "Lead Counsel") for all plaintiffs in the Actions following consolidation (thereinafter the "Consolidated Action").[1]

As detailed herein, each of the Actions are related cases within the meaning of Civil L.R. 3-12, and should be consolidated for pretrial proceedings before this Court.  In addition, the Weiser Firm should be appointed Lead Counsel for plaintiffs in the Consolidated Action given the firm's extensive experience in serving as lead counsel in numerous complex shareholder derivative actions and obtaining successful recoveries for the underlying corporate entities, including extensive governance improvements.  Notably, the Weiser Firm, acting as counsel to Plaintiff Berg, was the first firm to file the shareholder derivative claims on behalf of Intuitive referenced herein.

This Motion is made pursuant to Civil L.R. 3-12, Rule 42 of the Federal Rules of Civil Procedure, and this Court's April 8th Order.  The Motion is based upon the accompanying Memorandum of Points and Authorities, the Declaration of Brett D. Stecker in Support of Motion to

---

[1]   This Court's Order dated April 8, 2014 (the "April 8th Order") set April 25, 2014 as the deadline for the filing of motions seeking consolidation and appointment of lead counsel.  To the extent that the Court is also inclined to appoint a lead plaintiff, plaintiff Berg also moves to be appointed Lead Plaintiff.  *See* Declaration of Robert Berg in Support of Berg's Motion to Consolidate Related Actions and Appoint Lead Counsel, attached as Exhibit 3 to the Declaration of Brett D. Stecker in Support of Motion to Consolidate Related Actions and Appoint Lead Counsel.

1 Consolidate Related Actions and Appoint Lead Counsel filed concurrently herewith (the "Stecker

2 Decl."), and such additional evidence or argument as may be required or permitted by the Court.

3 **STATEMENT OF ISSUES TO BE DECIDED**

4   1.  Whether the Actions[2] are related within the meaning of Civil L.R. 3-12, and therefore

5 should be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure ("Rule

6 42(a)").

7   2.  Whether the Weiser Firm should be appointed as Lead Counsel for plaintiffs in the

8 Consolidated Action, in view of the firm's extensive and successful experience in litigating complex

9 shareholder derivative actions.[3]

10 **MEMORANDUM OF POINTS AND AUTHORITIES**

11   Berg submits this Memorandum in support of his Motion for: (1) consolidation of the

12 Actions; (2) appointment of the Weiser Firm as Lead Counsel; and (3) appointment of Berg as Lead

13 Plaintiff.

14 **I.  INTRODUCTION**

15   Plaintiff Berg submits this memorandum in support of his Motion to Consolidate Related

16 Actions and Appoint Lead Counsel (the "Motion") and in response to Scott+Scott, Attorneys At

17 Law, LLP's ("Scott+Scott") March 7, 2014 letter sent to this Court (the "March 7th Letter") (*see*

18 ECF Doc. No. 18 in Case No. 5:14-cv-00515-EJD) on behalf of Scott+Scott's client, the City of

19 Birmingham Relief and Retirement System ("Birmingham").[4]  As a preliminary matter, per the

20 Motion and the March 7th Letter, plaintiffs Berg and Birmingham agree that consolidation of the

21 Actions is appropriate.  Thus, the only disputed issue is which law firm is best-suited to serve as

22 Lead Counsel.  The instant Motion should be granted because plaintiff Berg's chosen counsel, the

---

23
24 [2]  For the Court's convenience, the Actions are also listed in a chart set forth at Appendix A hereto.

25
26 [3]  As noted above at n.1, to the extent the Court is inclined to appoint a Lead Plaintiff, Berg seeks appointment and submits Exhibit 3 to the Stecker Decl. in support of such request.

27 [4]  Plaintiff is aware that, pursuant to this Court's April 8th Order, Birmingham has also filed its own motion for consolidation and appointment of lead counsel and lead plaintiff.  Berg intends to oppose such motion.

28

1    Weiser Firm, has a sterling reputation for producing results in shareholder derivative litigation and

2    will vigorously prosecute the Actions for the benefit of Intuitive and its shareholders.

3          Apparently unable to match the Weiser Firm's very strong qualifications and results achieved

4    in shareholder derivative litigation, Scott+Scott's March 7th Letter relies on a "books and records"

5    inspection request pursuant to 8 Del. C. §220 ("Section 220") as its basis for appointment as Lead

6    Counsel.  Specifically, the March 7th Letter argues that "Scott+Scott, not Berg's counsel, should be

7    appointed lead counsel so that Scott+Scott and Birmingham can utilize the information gathered

8    through their §220 investigation to advance the interests of all Intuitive shareholders."  The notion,

9    however, that Scott+Scott uniquely is in possession of information that the Weiser Firm does not

10   possess is simply incorrect.  Indeed, the Company has voluntarily provided the Weiser Firm with the

11   same documents it produced to Scott+Scott.  *See* Declaration of Brett D. Stecker in Support of

12   Motion to Consolidate Related Actions and Appoint Lead Counsel filed concurrently herewith (the

13   "Stecker Decl."), ¶7.[5]

14         Notwithstanding that Scott+Scott possesses no more information than the Weiser Firm,

15   Scott+Scott's central premise is a fallacy.  Section 220 investigations – especially those such as

16   Birmingham's, in which all of the documents obtained by Scott+Scott were voluntarily produced by

17   the Company, as opposed to documents which a corporation is compelled to produce only after a

18   shareholder initiates, prosecutes, and wins an adversarial proceeding in the Delaware Chancery

19   Court pursuant to Section 220 – only very rarely (if ever) yield "smoking guns."  Scott+Scott's

20   passive acceptance of only those documents the Company was willing to produce and their apparent

21   unwillingness to litigate in order to obtain even a single additional document wholly undermines

22   their bluster and is telling as to whether in fact Scott+Scott has actually "advanced the ball" in any

23

24

25   [5]      On April 24, 2014, one day before motions seeking appointment of lead counsel were due
     pursuant to this Court's April 8th Order, Scott+Scott filed a last minute "amended" pleading on
26   behalf of Birmingham based, in part, on information obtained through Section 220.  *See* ECF Docket
     No. 13 in Case No. 5:14-cv-01307-EJD.  Presumably, Scott+Scott is aware that the Weiser Firm
27   possesses the very same information that Scott+Scott does, and this pleading should be seen for the
     tactical gambit that it is.
28
     PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
     ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
     SUPPORT THEREOF - **5:14-cv-00515-EJD**                                                    - 3 -

1    meaningful way.   Lead counsel appointments should be made based on what one actually

2    accomplishes.

3        In its March 7th Letter, Scott+Scott harshly criticizes the approach taken by Berg and the

4    Weiser Firm, claiming that "Delaware law looks with disfavor" upon shareholders and counsel who

5    choose not to avail themselves of Section 220 before filing derivative suits.  This is false.  Just last

6    year, the Delaware Supreme Court specifically rejected the notion that shareholders who file

7    derivative actions without first seeking books and records pursuant to Section 220 are inadequate

8    derivative representatives.  *Pyott v. La. Mun. Police Emp. Ret. Sys.,* 74 A.2d 612, 618 (Del. 2013).

9    In truth (though conspicuously not mentioned by Scott+Scott), Delaware courts have repeatedly

10   found that derivative plaintiffs adequately alleged demand futility without having first sought books

11   and records pursuant to Section 220, and sustained derivative complaints (either in whole or in part)

12   as a result.  *See, e.g.*, *Pfeiffer v. Leedle*, No. 7381-VCP, 2013 WL 5988416 (Del. Ch. Nov. 8, 2013);

13   *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007); *Pfeiffer v. Toll*, 989 A.2d 683, 691 (Del. Ch. 2010).

14   Federal courts applying Delaware law, including this Court and others in the Ninth Circuit, have

15   done so repeatedly as well.  *See, e.g.*, *Lynch v. Rawls*, 429 Fed. Appx. 641 (9th Cir. 2011); *In re HQ*

16   *Sustainable Maritime Indus., Inc., Derivative Litig.*, 826 F. Supp. 2d 1259 (W.D. Wash. 2011);[6] *In re*

17   *Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007).[7]  Contrary to Scott+Scott's

18   implications in its March 7th Letter, conducting a pre-suit investigation pursuant to Section 220 is

19   hardly a requirement for defeating Defendants'[8] anticipated motion to dismiss for failing to make a

20

---

21   [6]      Notably, in *HQ*, the Weiser Firm served as co-lead counsel for plaintiffs in the U.S. District

22   Court for the Western District of Washington.  Scott+Scott, meanwhile, served as plaintiffs' counsel
     in a substantially similar derivative action in the Superior Court of the State of Washington for King

23   County.  While the Weiser Firm adequately alleged demand futility and successfully withstood the
     defendants' motion to dismiss pursuant to Fed. R. Civ. P. 23.1, Scott+Scott's related derivative

24   action in state court was stayed while Scott+Scott unsuccessfully attempted to obtain pre-Rule 23.1
     disposition discovery.

25   [7]      Conversely, the citations to situations where stockholders and their counsel successfully

26   fought for Section 220 documents at trial (unlike Birmingham and Scott+Scott), prevailed and
     received "hot" documents, then proceeded to file an actual derivative complaint, and subsequently
     defeated a demand futility motion are sparse from Delaware jurisdictions or anywhere else.

27

28   [8]      "Defendants" include: Gary S. Guthart, Marshall L. Mohr, Lonnie M. Smith, David J. Rosa,
     Mark J. Meltzer, Jerome J. McNamara, Augusto V. Castello, Salvatore J. Brogna, Colin Morales,

1    pre-suit demand on Intuitive's Board of Directors (the "Board").  The Section 220 process is no

2    panacea, no "golden ticket" for stockholders seeking to hold boards of directors accountable for their

3    conduct, and to suggest otherwise is a red herring.

4            Further, while Scott+Scott claims superiority based solely on its Section 220 investigation, it

5    fails to address a very significant reason why this Court should give serious pause to appointing

6    Scott+Scott as Lead Counsel.  Scott+Scott, unlike the Weiser Firm, expressly markets itself and

7    holds itself out as a so-called "portfolio monitor" for institutional investors such as plaintiff

8    Birmingham.[9]  The U.S. District Court for the Northern District of Texas very recently opined on the

9    implications presented by law firms like Scott+Scott, which actively market their "portfolio

10   monitoring services" to institutional clients, when selecting a Lead Plaintiff and Lead Counsel.  *See*

11   *In re Kosmos Energy Ltd.*, Civ. A. No. 3:12-CV-373-B, 2014 WL 1293834 (N.D. Tex. Mar. 19,

12   2014) ("*Kosmos*").  In *Kosmos*, the Court expressed concern that in a lawsuit brought by a firm that

13   holds itself out and markets itself as a portfolio monitoring service for institutional investors, "it

14   appears that the potential representatives are 'simply lending their names to a suit controlled entirely

15   by the class attorney,' or where the representative is too 'closely affiliated with class counsel,' courts

16   may find them to be inadequate."  *Kosmos*, 2014 WL 1293834, at *9.  The Weiser Firm, which

17   almost exclusively represents individual investors, such as plaintiff Berg here, does not provide

18   "portfolio monitoring" services and of course does not market itself as such.  Accordingly,

19   Scott+Scott's "portfolio monitoring services" for institutional investors like Birmingham raise doubt

20   as to whether Scott+Scott is indeed best-suited to act as Lead Counsel for plaintiffs and act in the

21   best interests of the Company at all times.

22           In sum, the Motion should be granted because: (1) the Weiser Firm has an excellent

23   reputation litigating shareholder derivative actions and will more than adequately represent the

24   interests of the Company and all of its shareholders; (2) Scott+Scott's Section 220 "investigation"

25

26   Craig H. Barratt, Eric H. Halvorson, Amal M. Johnson, Alan J. Levy, Floyd D. Loop, Mark J.
     Rubash, and George Stalk Jr.

27   [9]      *See* http://www.scott-scott.com/portfolio-tracking-loss-recovery-system.html.

28   PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
     ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
     SUPPORT THEREOF - **5:14-cv-00515-EJD**                                              - 5

1   has not resulted in Scott+Scott obtaining any documents that are not in the possession of the Weiser

2   Firm, is not a prerequisite to defeating a motion to dismiss, and has not advanced the litigation in any

3   meaningful way; and (3) Scott+Scott providing and marketing its so-called "portfolio monitoring

4   services" for institutional investors such as Birmingham presents significant issues and questions

5   that the Weiser Firm does not face.  Thus, for the reasons stated herein, Berg respectfully requests

6   that this Court appoint the Weiser Firm as Lead Counsel.

7   **II.      FACTUAL BACKGROUND**

8          According to its public filings, Intuitive designs, manufactures, and markets da Vinci surgical

9   systems ("da Vinci"), and related instruments and accessories.  ¶2.[10]  Its da Vinci surgical system

10  translates a surgeon's natural hand movements, which are performed on instrument controls at a

11  console, into corresponding micro-movements of instruments positioned inside the patient through

12  small incisions or ports.  *Id.*  The da Vinci surgical system comprise a surgeon's console, a patient-

13  side cart, a 3-D vision system, da Vinci skills simulator, and Firefly fluorescence imaging product

14  that enable surgeons to perform various surgical procedures, including gynecologic, urologic,

15  general surgery, cardiothoracic, and head and neck surgical procedures.  *Id.*  During the Relevant

16  Period,[11] Defendants issued materially false and misleading statements regarding the Company's

17  business and financial results.  ¶3.  Specifically, Defendants failed to disclose that the Company's

18  flagship product, the da Vinci surgical system, was faulty, unsafe to use, and was causing injuries

19  and death.  *Id.*  During this time, Intuitive's stock traded as high as $588 per share on May 1, 2012.

20  *Id.*

21         Throughout the Relevant Period, Intuitive received thousands of injury and defect reports

22  related to surgeries using da Vinci.  ¶4.  The most dangerous injuries arose from burns to internal

23  organs caused by the discharge of electricity (usually in the form of sparks), caused by the robot's

24

25  [10]      All paragraph references are to Berg's Verified Shareholder Derivative Complaint for Breach
    of Fiduciary Duty, Gross Mismanagement, Abuse of Control and Unjust Enrichment filed in this
26  Court on February 3, 2014 (the "Berg Complaint").  *See* ECF Doc. No. 1 in Case No. 5:14-cv-
    00515-EJD.

27  [11]      The Relevant Period is defined as 2012 to the present.  ¶1.

28
    PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
    ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
    SUPPORT THEREOF - **5:14-cv-00515-EJD**                                              - 6 -

1    instruments inside the patient.   *Id.*   Despite the severity and multitude of reports, Defendants

2    systematically underreported these injuries and their seriousness to the United States Food and Drug

3    Administration (the "FDA").   *Id.*   As the reports continued to increase, however, the FDA finally

4    initiated an investigation in 2013, which culminated in the issuance of a warning letter on July 16,

5    2013 (the "FDA Warning Letter").   *Id.*   The FDA Warning Letter concluded that Intuitive had

6    concealed information from the FDA, secretly recalled defective parts, and ignored known injuries to

7    patients in its design process of critical da Vinci instruments.   *Id.*

8         Defendants had long been on notice that da Vinci was causing serious injuries to patients.

9    ¶6.   After inspecting Intuitive's headquarters in April and May 2013, the FDA reported that

10   Defendants had received hundreds of complaints and reports between July 2009 and December

11   2011.   *Id.*   The vast majority of these reports concerned a little rubber sleeve, inserted at the end of

12   certain da Vinci metal instruments, designed as an insulating device to prevent electricity from

13   radiating out.   *Id.*   The plastic sleeves were referred to as tip covers (the "Tip Cover").   *Id.*   The

14   critical defect consisted of cracks or slits that prevented the Tip Cover from properly insulating the

15   metal instruments and allowed electricity or sparks to escape, an effect known as arcing.   *Id.*

16   Because the arcing usually occurred outside of the surgeon's camera field of vision, blood vessels

17   and organs were burned without the medical team's knowledge.   *Id.*   Deaths occurred when patients

18   hemorrhaged internally for days while the bleeding remained undetected after the surgery.   *Id.*

19        Defendants were on notice about the defective Tip Covers and quietly sought to take

20   "corrective action" as early as October 2011.   ¶7.   According to the FDA Warning Letter, "[t]his

21   correction was in response to complaints and medical device reports (MDRs) for arcing through

22   damaged tip covers that caused patient injuries."   *Id.*   But Defendants did not report this corrective

23   action to the FDA as required, which the FDA subsequently classified in the July 2013 FDA

24   Warning Letter as a "Class II Recall."   *Id.*   In addition to the Tip Cover correction, Defendants

25   initiated two other corrective actions in October 2011, both of which were concealed from the FDA.

26   *Id.*

27

28

1    Aware of the increase in injuries caused by the defective Tip Covers, and after having

2    concealed the seriousness of the issue from the FDA by failing to report the October 2011 recall,

3    Defendants also engaged in a concerted effort to minimize the importance of the reports that did

4    reach the FDA.  ¶8.  As set forth in greater detail in the Berg Complaint, stringent FDA regulations

5    require that hospitals report to the manufacturer (*i.e.*, Intuitive) serious injuries arising from the use

6    of da Vinci.  *Id.*  In turn, these regulations also require Intuitive to submit these medical device

7    reports, or MDRs, to the FDA.  *Id.*  MDRs filed with the FDA are compiled in the FDA's

8    Manufacturer and User Facility Device Experience ("MAUDE") database.  *Id.*  To hide the da Vinci

9    defects, however, Defendants consistently underreported MDRs, misclassified them under the

10   innocuous category of "other," even though scores qualified as "serious injury," and added self-

11   serving disclaimers in the filed MDRs concerning the purported lack of evidence linking the injury

12   or harm to a da Vinci defect.  *Id.*

13       In September 2012, the FDA met with Defendants to address the Company's underreporting

14   and miscategorization of the MDRs.  ¶9.  As a result, Intuitive was required to change its reporting

15   policies by (i) reporting MDRs not previously submitted to the FDA, and (ii) upcoding many MDRs

16   previously labeled "other" to "serious injury."  *Id.*  It was only after these significant changes to

17   Intuitive's MDR reporting practices, and the material rise in serious MDR reports, that in January

18   2013 the FDA began a safety probe of the Company.  ¶10.  The FDA probe suggests that, after the

19   FDA realized in September 2012 that Defendants had been improperly labeling the MDRs, the FDA

20   did not fully trust the Company's role as a middleman between the hospital reports and those that

21   Intuitive submitted to the agency.  *Id.*  The FDA thus sent out a survey directly to hospitals in

22   January 2013 seeking, among other things, information concerning (i) problems or challenges with

23   da Vinci, (ii) complications during surgeries, (iii) problem-causing da Vinci devices, and (iv)

surgeons' familiarity with da Vinci recalls and corrective changes.  *Id.*  In addition to this written survey, the safety probe also included one-hour interviews with surgeons.  *Id.*

*Bloomberg* news publicly disclosed the FDA probe on February 28, 2013, only five minutes before the stock market closed.  ¶11.  The Company's stock price dropped $63 per share, from about $573 per share to $510 per share, resulting in the Company losing more than ten percent of its value.  *Id.*  Meanwhile, Defendants had been heavily selling their Company stock in unusual and suspicious trading.  ¶12.  Between February 2012 and March 2013, certain of the Defendants (including several members of the Board) sold 380,309 shares of their personally held Intuitive stock, reaping proceeds of over ***$207 million***.  *Id.*

Defendants thus pounced on the perception of robotic surgery as the future, with minimal trauma, and the same (if not greater) benefits as open surgery.  ¶14.  Defendants, however, did not disclose the known defects, patient injuries, and deaths, and their concerted efforts to conceal all this from the FDA and the public.  *Id.*  Defendants' ability to conceal these defects and problems, however, was soon to end.  ¶15.  After the FDA launched the safety probe in early 2013, it followed with a lengthy inspection of Intuitive's headquarters between April 1 and May 30, 2013.  *Id.*  At the end of the inspection, the FDA issued a Form FDA-483 ("Form 483")[12] to defendant Guthart, a member of the Board, setting forth the objectionable conditions.  *Id.*  There were four such observations, including the discovery by the FDA that Intuitive had carried out the secret recall of the Tip Covers in October 2011, as discussed above.  *Id.*  In addition, and equally dangerous to patients' health, Defendants were on notice since 2010 that surgeons needed to clean da Vinci

---

[12]     An FDA Form 483 lists objectionable conditions observed by the FDA during a facility inspection.  While the observations contained in a Form 483 report do not constitute a final agency determination regarding the facility's compliance with applicable laws and regulations, corrective action by the inspected company is expected. Indeed, an establishment may face legal sanctions available to the FDA, such as seizure, injunction, civil monetary penalties and prosecution, if it does not voluntarily correct serious conditions.

1  instruments while inside the patient's bodies, and that to do so they scrubbed one instrument against

2  another.  *Id.*  This had consistently led to tears or holes in the Tip Covers that led to arcing that in

3  turn caused injuries to patients.  *Id.*  FDA regulations thus required Defendants to address this "user

4  need" through a rigorous and heavily regulated design control process.  *Id.*  Defendants entirely

5  ignored this user need, did not document it, and never even sought to address this health risk in

6  flagrant violation of FDA regulations.  *Id.*

7

8          On July 18, 2013, Defendants caused the Company to announce that it had received the FDA

9  Warning Letter.  ¶20.  According to the FDA Warning Letter, (i) the Tip Covers constituted

10  "misbranded devices"; (ii) Intuitive knew that the Tip Covers in October 2011 posed a risk to health

11  and, yet, Intuitive proceeded to conduct a secret recall while failing to report this "correction,"

12  thereby violating FDA reporting requirements; (iii) Intuitive also knew that the intraoperative

13  cleaning of da Vinci instruments caused the Tip Covers to fail, leading to arcing, and yet ignored the

14  problem, again violating FDA regulations including Current Good Manufacturing Practices; and (iv)

15  after having been notified of these violations pursuant to the Form 483, Intuitive had submitted

16  incomplete and inadequate responses to the FDA on June 7, 2013.  ¶21.  Tellingly, the FDA

17  Warning Letter added, "[t]he FDA has previously informed you of your firm's correction and

18  removal violations in an untitled letter dated February 19, 2008, and FDA 483 Inspectional

19  Observations issued on December 20, 2002."  *Id.*  In saying this, the FDA was confirming that

20  failing to report corrections and removals (*i.e.*, the secret recall) was an ongoing, unsolved issue with

21  Intuitive.  *Id.*

22

23          After the above revelations seeped into the market, the Company's shares fell dramatically.

24  Further, as a result of Defendants' breaches, the price of the Company's stock still has not recovered.

25  Accordingly, as a result of Defendants' breaches, the Company has been damaged.

26

27

28

1  **III.   PROCEDURAL HISTORY**

2          Two derivative actions have been filed in this Court on behalf of Intuitive.  On February 3,

3  2014, Berg initiated the Actions by filing the Berg Complaint (Case No. 5:14-cv-00515-EJD).  On

4  March 21, 2014, Birmingham filed the second derivative complaint (Case No. 5:14-cv-01307-EJD).

5  An additional, related shareholder derivative action was removed to this District on March 26, 2014.

6  On April 8, 2014, the Court entered the April 8th Order requiring the filing of motions for

7  consolidation and appointment of lead counsel by April 25, 2014.  Plaintiff Birmingham filed an

8  "amended" complaint on April 24, 2014.

9          Plaintiffs in the Actions allege similar causes of action on behalf of Intuitive against most of

10  the same Defendants, and each action arises out of the same nucleus of operative facts.  Therefore,

11  Berg seeks to consolidate the Actions.[13]  As argued below, the Actions cannot progress further until

12  a leadership structure identifying the Lead Counsel who has the authority to prosecute the Actions is

13  established.[14]

14  **IV.   LEGAL ARGUMENT**

15          **A.       Consolidation of the Actions**

16          Berg requests that this Court consolidate the Actions.[15]  Rule 42(a) of the Federal Rules of

17  Civil Procedure governs consolidation and provides the following:

18  _____

19  [13]      On February 21, 2014, plaintiff Public School Teachers' Pension and Retirement Fund of
    Chicago ("the Chicago Fund") filed a substantially similar shareholder derivative action on behalf of
20  Intuitive in San Mateo Superior Court captioned *Public School Teachers' Pension and Retirement
    Fund of Chicago v. Guthart, et al.*, CIV 526930 (the "*Chicago* Action").  On March 26, 2014, the
21  defendants to the *Chicago* Action filed a notice of removal to this Court.  On April 24, 2014, the
    Chicago Fund filed a motion for remand.  Accordingly, to the extent that defendants' removal is
22  upheld and the *Chicago* Action is not remanded to state court, Berg respectfully submits that the
    *Chicago* Action should likewise be consolidated with the other Actions, and reserves all rights and
23  arguments with respect to the appointment of the Weiser Firm as Lead Counsel over the Chicago
    Fund's counsel, as well as his appointment as Lead Plaintiff over the Chicago Fund, irrespective of
24  whether the Chicago Fund files a motion pursuant to the Court's April 8th Order.

25  [14]      Scott+Scott made no attempt whatsoever to contact the Weiser Firm prior to filing its March
    7th Letter with this Court.  Stecker Decl. at ¶8.  Nonetheless, after the March 7th Letter was sent by
26  Scott+Scott, the Weiser Firm contacted Scott+Scott and proposed a leadership structure whereby the
    two firms would prosecute the Actions jointly and serve as co-lead counsel for plaintiffs.
27  Scott+Scott flatly rejected the Weiser Firm's proposal, necessitating the filing of this Motion.  *Id.*

28  [15]      Scott+Scott's March 7th Letter indicates that they do not oppose consolidation.

PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF - **5:14-cv-00515-EJD**                                                    - 11 -

1    If actions before the court involve a common question of law or fact, the court may:

2        (1)    join for hearing or trial any or all matters at issue in the actions;

3        (2)    consolidate the actions; or

4        (3)    issue any other orders to avoid unnecessary cost or delay.

5        The power to consolidate related actions falls within the broad inherent authority of every

6    court "'to control the disposition of the causes on its docket with economy of time and effort for

7    itself, for counsel and for litigants.'"  *Lester-Krebs, Inc. v. Geffen Records, Inc.*, No. 85 Civ. 6320,

8    1985 U.S. Dist. LEXIS 13201, at *4 (S.D.N.Y. Dec. 4, 1985) (quoting *Landis v. N. Am. Co.*, 299

9    U.S. 248, 254 (1936)).  A court has discretion to consolidate related cases which involve common

10   questions of fact and law under Rule 42(a) "under the policy that considerations of judicial economy

11   strongly favor simultaneous resolution of all claims growing out of one event."  *Ikerd v. Lapworth*,

12   435 F.2d 197, 204 (7th Cir. 1970); *see also Schriver v. Impac Mortgage Holdings, Inc.*, No. SACV

13   06-31 CJC (RNBx), 2006 U.S. Dist. LEXIS 40607, at *6 (C.D. Cal. May 1, 2006).

14       Courts have indeed recognized that consolidation of similar shareholder actions can be

15   beneficial to the Court and the parties by "'expediting pretrial proceedings, avoiding duplication . . .

16   and minimizing expenditure of time and money.'"  *In re Equity Funding Corp. of Am. Sec. Litig.*,

17   416 F. Supp. 161, 176 (C.D. Cal. 1976) (citation omitted); *see also MacAlister v. Guterma*, 263 F.2d

18   65, 68 (2d Cir. 1958) ("[t]he purpose of consolidation is to permit trial convenience and economy in

19   administration"); *Takeda v. Turbodyne Techs., Inc.*, 67 F. Supp. 2d 1129, 1133 (N.D. Cal. 1999)

20   (consolidation pursuant to Fed. R. Civ. P. 42(a) eases the burden on all parties involved).  "[W]hen

21   consolidation is appropriate, the Court has the discretion to order the consolidation of subsequently-

22   filed or transferred cases that allege similar facts as those alleged in the current shareholder

23   derivative suits."  *Horn v. Raines*, 227 F.R.D. 1, 2 (D.D.C. 2005) (ordering consolidation of all

24   related derivative actions); *Schriver*, 2006 U.S. Dist. LEXIS 40607, at *6.

25       Here, consolidating the Actions will no doubt aid the convenience of the Court to decide

26   these cases.  The Actions present substantially identical issues and relate to whether Intuitive's

27   directors and certain senior officers breached their fiduciary obligations to the Company and its

28

stockholders.  As a result, each individual case will involve essentially the same motion practice, discovery, and trial considerations.  In addition, no "substantial rights" of any party will be prejudiced by consolidation.  In fact, the rights of the parties to a speedy discovery process, consistent adjudications, and cooperative discovery efforts will enhance all parties' rights to a fair and equitable adjudication of their dispute.  Accordingly, the Actions should be consolidated.

### B.    The Court Should Appoint the Weiser Firm as Lead Counsel

#### 1.    Appointment of Lead Counsel is Necessary to Effectively Prosecute the Consolidated Action

Berg respectfully requests that this Court appoint the Weiser Firm as Lead Counsel.  A court which has consolidated actions may, at its discretion, appoint Lead Counsel to prosecute the consolidated cases.  Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* §2385 (2d ed. 1987) (cited in *Walker v. Deutsche Bank, AG*, No. 04 Civ. 1921 (DAB), 2005 U.S. Dist. LEXIS 19776, at *8 (S.D.N.Y. Sept. 6, 2005)).  *MacAlister*, 263 F.2d at 65, is the seminal case on this point.  In that case, the Second Circuit recognized that "[t]he benefits achieved by consolidation and the appointment of general counsel, *i.e.* elimination of duplication and repetition and in effect the creation of a coordinator of diffuse plaintiffs through whom motions and discovery proceedings will be channeled, will most certainly redound to the benefit of all parties to the litigation." *Id.* at 69.

Moreover, the *Manual for Complex Litigation* recognizes the benefits of appointing Lead Counsel in complex, multiparty litigation:

> Complex litigation often involves numerous parties with common or similar interests but separate counsel.  Traditional procedures in which all papers and documents are served on all attorneys, and each attorney files motions, presents arguments, and examines witnesses, may waste time and money, confuse and misdirect the litigation, and burden the court unnecessarily.  Instituting special procedures for coordination of counsel early in the litigation will help to avoid these problems.

*Manual for Complex Litigation* (Fourth) §10.22 (4d ed. 2004).

#### 2.    The Weiser Firm Should Be Appointed as Lead Counsel

In selecting Lead Counsel, the "guiding principle" is who will "best serve the interest of the plaintiffs." *Millman v. Brinkley*, No. 1:03-cv-3831-WSD, 2004 U.S. Dist. LEXIS 20113, at *9 (N.D.

Ga. Oct. 1, 2004).  The criteria for selecting Lead Counsel include, *inter alia,* counsel's experience and prior success record.  *Id.* (citations omitted).  Over the past decade, the Weiser Firm has earned an excellent reputation as a nationwide leader in prosecuting stockholder derivative claims.

Indeed, Robert B. Weiser, the founder and managing partner of the Weiser Firm, has been involved in some of the most successful shareholder derivative actions in history, including the ground-breaking *In re Prison Realty Sec. Litig.*, Civ. A. No. 3:99-0452 (M.D. Tenn.) ("*Prison Realty*") case.[16]  *See* Stecker Decl., Exhibit 1.  In addition to *Prison Realty*, Robert Weiser has personally been involved in many other important shareholder derivative actions, which have expanded or secured the rights of stockholders, including the well-known *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003) (one of the largest derivative settlements ever at the time it was agreed to);[17] *David v. Wolfen, et al*. ("*Broadcom*"), No. 01-CC-03930 (Orange Cnty.

---

[16]     In *Prison Realty*, the plaintiffs challenged the transfer of assets from Prison Realty to a private entity owned and controlled by several of the company's top executives.  Plaintiffs also alleged that the proposed transaction would have crippled the company's liquidity.  Plaintiffs were able to halt the planned transaction, which prevented the company from suffering a $120 million loss, which was a highly significant victory in light of the company's then-precarious financial position.  As a result of the settlement of the case, the members of the company's top management were removed, the composition of the board of directors was significantly altered, and important corporate governance provisions were also put in place to prevent future abuse.  Notably, all of these corporate benefits occurred at a time when the company was facing near-certain bankruptcy, which would have extinguished shareholders' equity in the company.  Because the company had adopted these significant changes, it was able to renegotiate the terms of its credit facility with its lenders and it never had to file for bankruptcy protection.  Since the time the case was settled, the company's new management has led the company, now-named Corrections Corporation of America, to profitability, and the price of the common stock increased more than 400% in the two years following the settlement.

[17]     In *Oracle*, the plaintiffs challenged certain multi-million dollar stock sales made by Oracle's senior officers, including its founder, Larry Ellison.  Oracle's board of directors appointed a special litigation committee ("SLC") to investigate plaintiffs' claims, and after a lengthy investigation, the SLC moved to dismiss the case, having concluded that the claims lacked merit.  Among other things, the plaintiffs challenged the independence of the SLC members, their good faith, and their ultimate conclusions.  The Delaware Chancery Court denied the SLC's motion to dismiss, allowing the action to proceed to trial.  At the time it was issued, the *Oracle* decision was one of only four reported Delaware cases where an SLC's motion to dismiss was denied by a Delaware chancellor, and many commentators view the *Oracle* case as a landmark decision for shareholders.  For example, the *Wall Street Journal* called the seminal *Oracle* decision "one of the most far-reaching ever on corporate governance."  The *Oracle* case eventually settled for $100 million, making it one of the largest derivative settlements in history at the time it was entered into.  *Oracle*, and its impact on corporate governance matters nationwide, is the subject of numerous scholarly articles and treatises.

1   Sup. Ct.);[18] *Gebhardt v. Allumbaugh, et al.* ("*El Paso*"), No. 2002-13602 (Tex. Dist. Ct., Harris

2   Cnty.),[19] and *Barry v. Cotsakos* ("*E\*Trade*"), No. CIV419084 (Cal. Super. Ct., San Mateo Cnty.).[20]

3   Notably, every single one of these cases (*Prison Realty*, *Oracle*, *Broadcom*, *El Paso* and *E\*Trade*)

4   was filed as a "demand futility" case **without** first requesting the inspection of corporate books and

5   records.[21]

6         In addition to the foregoing, beginning in 2006, the Weiser Firm was at the forefront of the

7   national investigation and prosecution of derivative "stock option backdating" cases. In connection

8

---

9   [18]     Like *Oracle*, *Broadcom* produced a groundbreaking settlement. In connection with the

10 eventual settlement of *Broadcom*, plaintiffs were able to compel Broadcom to make sweeping, substantial changes to its corporate governance practices, which included a provision that allows

11 Broadcom's shareholders to nominate directors to Broadcom's board of directors. In particular, the shareholder-nominated director provision was thought to be a highly significant and unusual

12 achievement for Broadcom's shareholders. As the *Associated Press* reported in commenting on the settlement: "[i]n contrast to the Broadcom settlement] the Securities and Exchange Commission has

13 met fierce resistance to a proposal just to allow shareholder nominations under very limited circumstances." Bruce Meyerson, *Shareholder Suits Means More Money For Lawyers, But Bring*

14 *Governance Gains*, Associated Press, July 27, 2004. This type of corporate governance relief has only been achieved in a handful of shareholder derivative actions.

15   [19]     The *El Paso* derivative action centered on the corporation's alleged anti-competitive conduct in California during the energy crisis of 2001-2002. In addition to sweeping changes to the Board's

16 structure and the company's corporate governance practices, a $16.75 million recovery was achieved for the company. The *El Paso* settlement remains one of the largest derivative settlements in Texas

17 history.

18   [20]     In the *E\*Trade* derivative litigation, the plaintiff challenged the payment of alleged excessive compensation awarded to E\*Trade's then-current CEO. This case was fraught with substantial

19 difficulties from the start – challenging executive compensation awarded at a public corporation has proved to be near-impossible since the Delaware Supreme Court's decision in *Aronson v. Lewis*, 473

20 A.2d 805 (Del. 1984), due to the historical protections afforded directors under the business judgment rule. Nonetheless, the plaintiff was able to achieve a remarkable settlement, which

21 included the CEO returning approximately $25 million in value to the company, along with sweeping changes to the company's corporate governance practices and the structure of its board of

22 directors. These measures, and the resulting change in the public's perception of E\*Trade, were profiled in a *Wall Street Journal* article. *See* Suzanne Craig, *How One Firm Uses Strict Governance*

23 *To Fix Its Troubles*, The Wall Street Journal, Aug. 21, 2003 at A1, A6. Since the time of the *E\*Trade* settlement, E\*Trade added independent directors to its Board, who subsequently forced out

24 the Company's CEO. In response to these changes, the Company's stock increased more than 300% in the 18 months following the settlement and the "new E\*Trade" became the subject of several

25 positive media reports.

26   [21]     Thus, while Scott+Scott paints the suitability of counsel issue as one of "propriety" (by suggesting that the Weiser Firm failed to follow the "correct" or "required" procedure), in truth, the

27 question is better-framed as a mere tactical dispute (or difference) between experienced lawyers, hardly the scandal that Scott+Scott implies.

28 PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF - **5:14-cv-00515-EJD**                                   - 15

1    therewith, the Weiser Firm was appointed Lead or Co-Lead Counsel in scores of cases, and was

2    partially responsible for the recovery of over $100 million in settlements for the subject corporations.

3    *See, e.g.*, *In re Home Depot, Inc., Derivative Litig.*, No. 07-CV-0356-RLV (N.D. Ga.); *In re KB*

4    *Home S'holder Derivative Litig.*, No. CV-06-05148-FMC(CTx) (C.D. Cal.); *In re Family Dollar,*

5    *Inc., S'holder Derivative Litig.*, No. 06-CV-00510(W) (W.D.N.C.).[22]   In short, the obvious talent of

6    the Weiser Firm dictates that it is amply qualified to serve as Lead Counsel for the Actions.

7           On top of the above roster of stellar results, in *In re KeyCorp Derivative Litig.*, No. 1:10-cv-

8    01786-DAP (N.D. Ohio 2010), the Weiser Firm served as lead counsel and produced the first-ever

9    settlement of any "say-on-pay" derivative action.   The *KeyCorp* derivative action was based on

10   allegations of misconduct arising from the failure of the KeyCorp board of directors to amend the

11   executive compensation awarded for 2009, even though a majority of KeyCorp's voting stockholders

12   rejected such compensation in a "say on pay" vote.   The settlement of the *KeyCorp* case provided for

13   a series of corporate governance measures related to: (a) the ideological underpinnings of

14   compensation principles at KeyCorp; (b) the actual award of executive compensation at KeyCorp;

15   (c) the disclosure of those decisions and ideology in KeyCorp's financial filings; (d) the composition

16   of the KeyCorp Board, its sub-committees, and their advisors; and (e) KeyCorp's and its Board's

17   ongoing relationship with KeyCorp shareholders.   In addition, pursuant to the *KeyCorp* settlement,

18   certain of the defendants relinquished highly-valuable economic rights which existed under their

19   respective employment contracts.[23]

20

21   [22]      In 2010, the Weiser Firm obtained $6.5 million on behalf of TeleTech Holdings, Inc., as well
     as a comprehensive set of corporate governance reforms, in a shareholder derivative action brought
22   in the Delaware Chancery Court entitled, *Gregory v. Tuchman,* C.A. No. 3925-CC (Del. Ch.)
     ("*TeleTech*").   During the hearing in which the settlement was finally approved, Chancellor
23   Chandler cited the *TeleTech* case as a "very generous" settlement which was "highly beneficial" to
     TeleTech and its stockholders.   *See*   Transcript of January 5, 2010 Settlement Hearing at 26-27
24   attached as Exhibit 2 to the Stecker Decl.   Chancellor Chandler also specifically complimented
     plaintiff's counsel for their efforts.   *Id.*   No attempt was made to inspect corporate books and records
25   pursuant to Section 220 prior to the filing of the *TeleTech* case.

26   [23]      KeyCorp is an Ohio corporation, and Ohio has a books and records inspection statute that is
     very similar to Section 220.   *See* Ohio Rev. Code Ann. § 1701.37.   *KeyCorp* is yet another example
27   of a positive result achieved by the Weiser Firm without first conducting a books and records
     investigation.

28   PLAINTIFF ROBERT BERG'S NOTICE OF MOTION AND MOTION TO CONSOLIDATE RELATED
     ACTIONS AND APPOINT LEAD COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN
     SUPPORT THEREOF - **5:14-cv-00515-EJD**                                                      - 16 -

1   Finally, in 2011, the Weiser Firm obtained extraordinary relief in connection with the

2   settlement of a shareholder derivative action brought on behalf of Vitacost.com, Inc. ("Vitacost"),[24]

3   which actually preserved that Delaware corporation's corporate form and the equity interests of its

4   shareholders.   The *Vitacost* derivative action centered upon Vitacost's December 7, 2010

5   announcement that its historical financial statements could not be relied upon due to a failure to

6   adhere to certain critical Delaware corporate formalities fourteen years earlier.  As a result, trading in

7   Vitacost stock was halted by NASDAQ and Vitacost stockholders held illiquid shares of uncertain

8   legal status.  Pursuant to the settlement, the Court entered an Order which: (1) confirmed the number

9   of shares in the Company based on the number of outstanding shares in the Company's initial public

10  offering in 2009 (in effect, "quieting title" to Vitacost shares), thus reassuring Vitacost stockholders

11  and the market that Vitacost's outstanding shares and options were valid; and (2) deemed Vitacost's

12  certificate of incorporation under Delaware law to be valid and effective.   In the absence of this

13  settlement, Vitacost could not have become "current" with respect to its historical financial

14  statements, its stock could not have resumed trading, and Vitacost would have almost certainly been

15  forced to file for bankruptcy.  This settlement was unprecedented and historic, and, in essence, saved

16  Vitacost and the equity interests of its stockholders.   Notably, the Vitacost action was likewise

17  initiated without previously conducting a Section 220 investigation.

18          Accordingly, because it is best-suited to protecting Intuitive's interests in the Actions, the

19  Weiser Firm should be appointed as Lead Counsel.

20              **3.       Scott+Scott Should Not Be Appointed Lead Counsel**

21                  **a.       Scott+Scott's 220 Investigation Is Unpersuasive**

22          Scott+Scott's March 7th Letter posits that it should be appointed lead counsel because, on

23  Birmingham's behalf, they "conducted an investigation pursuant to 8 *Del. C.* §220 and uncovered

24  numerous relevant books and records from nominal defendant Intuitive Surgical, Inc. ("Intuitive")

25  that have allowed Birmingham to draft a superior complaint that will advance the interest of all

26

27  [24]      *See Kloss v. Kerker, et. al.*, Case No. 50 2010 CA 018594XXXXMB (Fla. Cir. Ct., 15th Jud.

28  Cir., Palm Beach Cnty.).

1    Intuitive shareholders."  Scott+Scott further states that "Delaware law looks with disfavor on the

2    appointment of lead counsel who, like Berg's counsel here, eschew the use of a §220 and instead file

3    a weak placeholder complaint in an effort to obtain 'lead' status."

4         First, Scott+Scott's assertion that Berg's 86-page, 254-paragraph complaint is a "weak

5    placeholder complaint" that was filed "in an effort to obtain 'lead' status'" is disingenuous, at best.

6    Additionally, Scott+Scott's argument that they should be appointed Lead Counsel solely because

7    they issued a Section 220 inspection demand and, thus, somehow have a better chance of succeeding

8    on the merits, is likewise at odds with the realities of the Delaware demand futility decisions.  In

9    particular, despite Scott+Scott's implications to the contrary, the Delaware courts have repeatedly

10   found that derivative plaintiffs adequately alleged demand futility *without* having first sought books

11   and records pursuant to Section 220, and sustained derivative complaints (either in whole or in part)

12   as a result.  *See, e.g.*, *Leedle*, 2013 WL 5988416; *Ryan*, 918 A.2d 341; *Toll*, 989 A.2d at 691; *Weiss*

13   *v. Swanson,* 948 A.2d 433 (Del. Ch. 2008); *Conrad v. Blank,* 940 A.2d 28 (Del. Ch. 2007); *In re*

14   *Tyson Foods, Inc*., 919 A.2d 563 (Del. Ch. 2007); *In re Citigroup*, *Inc. S'holder Derivative Litig*.,

15   964 A.2d 106 (Del. Ch. 2009); *MCG Capital Corp. v. Maginn,* No. 4521-CC, 2010 WL 1782271

16   (Del. Ch. Mar. 3, 2010); *Seinfeld v. Slager,* No. 6462–VCG, 2012 WL 2501105 (Del. Ch. June 29,

17   2012); *In re The Student Loan Corp. Derivative Litig*., No. 17799, 2002 WL 75479 (Del. Ch. Jan. 8,

18   2002).  Indeed, last year the Delaware Supreme Court specifically rejected the notion that

19   shareholders who file derivative actions without first seeking books and records pursuant to Section

20   220 are inadequate derivative representatives.  *Pyott*, 74 A.2d at 618.

21        Of course, federal courts (including courts in this Circuit) have also similarly excused pre-

22   suit demand under Delaware law in derivative actions where the plaintiffs did not first seek books

23   and records pursuant to Section 220.  *See, e.g.*, *HQ*, 826 F. Supp. 2d 1259; *Zoran*, 511 F. Supp. 2d

24   986; *In re Affymetrix Derivative Litig.*, No. C 06-05353 JW, 2008 WL 5050147 (N.D. Cal. Mar. 31,

25   2008); *In re Countrywide Fin. Corp. Derivative Litig.,* 554 F. Supp. 2d 1044 (C.D. Cal. 2008); *In re*

26   *TASER Int'l S'holder Derivative Litig.,* No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. Mar.

27   17, 2006); *Travis v. Mittelstaedt, et al.*, No. CV 06-2341, 2008 WL 755842 (E.D. Cal. Mar. 19,

28

2008); *Lynch*, 429 Fed. Appx. 641; *Edmonds v. Getty*, No. 524 F. Supp. 2d 1267 (W.D. Wash. 2007); *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006); *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477 (D.N.J. 2007); *Engel v. Sexton*, 06-10447, 2009 WL 361108 (E.D. La. Feb. 11, 2009); *Cook ex rel. Career Educ. Corp. v. McCullough*, 11-CV-9119, 2012 WL 3488442 (N.D. Ill. Aug. 13, 2012).[25]

Further, the reason why Scott+Scott chose to passively accept the documents provided by the Company and not actually litigate a Section 220 case in Delaware to obtain anything further is obvious – the litigation of a Section 220 action is time consuming, expensive, and frequently results in a defeat. *See, e.g.*, *Cook v. Hewlett-Packard Co.*, No. 8667–VCG, 2014 WL 311111 (Del. Ch. Jan. 30, 2014) (denying shareholder's request for additional books and records following trial in action brought pursuant to Section 220, even where plaintiff argued that documents previously produced by corporation were "irrelevant filler material and/or are so heavily redacted and sanitized as to be useless"). Additionally, obtaining documents pursuant to Section 220 hardly means a shareholder will be able to subsequently secure a demand futility victory, as this Court has repeatedly demonstrated. *See, e.g.*, *In re CNET Networks, Inc. S'holder Derivative Litig.*, No. C 06-03817 WHA, 2008 WL 2445200 (N.D. Cal. June 16, 2008) (granting motion to dismiss under Fed. R. Civ. P. 23.1 and finding that pre-suit demand was required under Delaware law even where plaintiffs' complaint was based on books and records previously obtained pursuant to Section 220); *In re Verifone Holdings, Inc. S'holder Derivative Litig.*, Nos. C 07-6347 MHP, C 07-6140 MHP, 2010 WL 3385055 (N.D. Cal. Aug. 26, 2010) (same); *In re Fannie Mae Derivative Litig.*, 503 F.

---

[25] The Weiser Firm was involved in many of the above-cited decisions. In particular, the Weiser Firm served as court-appointed lead counsel or co-lead counsel in *HQ* and *TASER*. Stecker Dec. at ¶4. Additionally, the Weiser Firm served as plaintiffs' counsel and made meaningful contributions in *Pfizer, SFBC, Belova*, *Engel*, and *Veeco*. Stecker Dec. at ¶5. *Pfizer* was another case in which the plaintiffs achieved exceptional results in the form of a $75 million payment for the company and comprehensive corporate governance reforms, including the creation of a new healthcare law regulatory committee. Needless to say, the Weiser Firm has ample experience in defeating demand futility motions and obtaining excellent results without first conducting a Section 220 investigation.

Supp. 2d 9 (D.C. Cir. 2008) (same).   Accordingly, while Scott+Scott touts their Section 220 "investigation," they fail to indicate that they never actually **litigated** pursuant to Section 220, and the documents provided to them are the same documents Defendants provided to Berg.  Stecker Decl., ¶7.  Thus, Scott+Scott's assertion that because they "conducted" a Section 220 investigation that somehow the *Birmingham* Action is better-positioned than the *Berg* Action is simply at odds with both the legal realities and factual circumstances present in the Actions.  In short, Scott+Scott's Section 220 investigation has yielded the exact same results as the *Berg* Action and most certainly does not weigh in favor of appointing Scott+Scott as Lead Counsel.

> **b.    Scott+Scott's Client Monitoring Service Weighs Against Them Being Appointed Lead Counsel**

In addition to Scott+Scott's misplaced reliance on its Section 220 investigation, Scott+Scott actively holding itself out as a portfolio monitor for institutional investors also weighs against their appointment as Lead Counsel.  Scott+Scott's website touts their "Portfolio Tracking + Loss Recovery System," which purportedly "acts as an electronic portfolio watchdog, creating triggers when certain events occur pertaining to corporate fraud that may require action, and provides the information and insight necessary to make careful and informed decisions as to corporate fraud-related investment losses, whether that be to actively participate in securities in securities class-action litigation as a representative plaintiff, to remain a silent beneficiary of class-action litigation as an absent class member, or to pursue private litigation on a non-class action basis."  As discussed below, because Scott+Scott holds itself out as a portfolio monitor for institutional investors, they are not the most suitable choice for Lead Counsel, nor is Birmingham the most suitable choice for Lead Plaintiff.

The situation at bar here is analogous to the Northern District of Texas's recent decision in *Kosmos,* 2014 WL 1293834.  In *Kosmos*, the court criticized (and ultimately denied) the prospective class counsel's application because, *inter alia*, the plaintiff in question was an institutional investor whose investments were "monitored" by a substantially similar portfolio monitoring system and, thus, the court found this fact "strongly suggests that this is a lawyer and not a client-driven suit." *Id.* at *13.  Notably, the monitoring service at issue in *Kosmos* is nearly identical to the monitoring

1  service that Scott+Scott touts on their website. *Id.* ("As its exclusive securities monitoring service,
2  [the securities monitoring law firm] monitors the Plan's securities investments for 'wrongdoing[]
3  [or] fraud' and provides a report to the Plan's legal counsel if it finds any such activity… This
4  monitoring service … is provided by the firm free of cost; [the securities monitoring law firm], in
5  turn, is designated to represent the Plan if suit is filed, thereby recouping its costs through the
6  successful prosecution of the securities fraud case in the courts."). In criticizing this type of
7  monitoring service, the court specifically stated that "[t]his type of free securities monitoring service
8  that [the securities monitoring law firm] provides the Plan has been criticized by other courts as
9  'foster[ing] the very tendencies toward lawyer-driven litigation that the PSLRA was designed to
10 curtail,' as it 'creates a clear incentive for [the securities monitoring law firm] to discover 'fraud' in
11 the investments it monitors and to recommend…that [the client], at no cost to itself, bring a class
12 action lawsuit.'" *Id.*; *see also Iron Workers Local No. 25 Pension Fund v. Credit Based Asset Serv.*
13 *And Securitization, LLC*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009). Finally, the court stated that
14 when (as is the case for Scott+Scott) "it appears that the potential representatives are 'simply lending
15 their names to a suit controlled entirely by the class attorney,' or where the representative is too
16 'closely affiliated with class counsel,' courts may find them to be inadequate." *Kosmos*, 2014 WL
17 1293834, at *9.

18     Here, just as in *Kosmos*, Scott+Scott employs a portfolio monitoring service and exerts the
19 same level control over its institutional investors in terms of which cases are filed. The Weiser Firm,
20 on the other hand, employs no such portfolio monitoring service and almost exclusively represents
21 active individual investors, such as plaintiff Berg. Stecker Decl., ¶3. Accordingly, in light of
22 Scott+Scott's clearly lawyer-driven portfolio monitoring service, they are not the most adequate
23 choice for Lead Counsel and Birmingham is not the most adequate choice for Lead Plaintiff.

24 **V.    CONCLUSION**

25     For the foregoing reasons, the Court should consolidate the above-captioned Actions and
26 appoint the Weiser Firm as Lead Counsel. To the extent the Court is inclined to appoint a Lead
27 Plaintiff, it should appoint plaintiff Berg.

28

DATED:  April 25, 2014

Respectfully submitted,

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (SBN 168562)


/s/ Kathleen A. Herkenhoff
KATHLEEN A. HERKENHOFF

12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile: 858/794-1450

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER (*pro hac vice*)
BRETT D. STECKER (*pro hac vice*)
JEFFREY J. CIARLANTO (*pro hac vice*)
22 Cassatt Avenue, First Floor
Berwyn,  PA 19312
Telephone: 610/225-2677
Facsimile: 610/ 408-8062

Proposed Lead Counsel for Plaintiffs and Counsel
for Plaintiff Robert Berg

RYAN & MANISKAS, LLP
RICHARD A. MANISKAS
995 Old Eagle School Road, Suite 311
Wayne, PA  19087
Telephone:  484/588-5516
484/450-2582 (fax)
rmaniskas@rmclasslaw.com

Counsel for Plaintiff Robert Berg

**APPENDIX A**

The related Actions currently pending in this District are as follows:

| Case Name | Case No. | Date Filed |
|---|---|---|
| *Berg v. Guthart, et al.* | Case No. 5:14-cv-00515-EJD | 2/3/14 |
| *City of Birmingham Relief and Retirement System v. Guthart, et al.* | Case No. 5:14-cv-01307-EJD | 3/21/14 |
| *Public School Teachers' Pension and Retirement Fund of Chicago v. Guthart, et al.* | Case No. 3:14-cv-01384-LB | 3/26/14[1] |

---

[1] The referenced action was initially filed on February 21, 2014 in the Superior Court for the State of California, County of San Mateo, and thereafter removed to this District on March 26, 2014.

1

<u>CERTIFICATE OF SERVICE</u>

2        I hereby certify that on April 25, 2014, I authorized the electronic filing of the foregoing with

3 the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4 e-mail addresses denoted on the attached Electronic Mail Notice List.

5        I certify under penalty of perjury under the laws of the United States of America that the

6 foregoing is true and correct.  Executed on April 25, 2014.

7                                        s/ KATHLEEN A. HERKENHOFF
                                         KATHLEEN A. HERKENHOFF
8
                                         THE WEISER LAW FIRM, P.C.
9                                        12707 High Bluff Drive, Suite 200
                                         San Diego, CA 92130
10                                       Telephone: 858/794-1441
                                         Facsimile: 858/794-1450
11
                                         Email: kah@weiserlawfirm.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:14-cv-00515-EJD Berg v. Guthart et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael D. Celio**
  mdc@kvn.com,gpeterson@kvn.com,efiling@kvn.com

- **Jeffrey Joseph Ciarlanto**
  jjc@weiserlawfirm.com

- **Jo W. Golub**
  jgolub@kvn.com,efiling@kvn.com,SHarmison@kvn.com,sgiminez@kvn.com,jah@kvn.com

- **Cody Shawn Harris**
  charris@kvn.com,jsmith@kvn.com,efiling@kvn.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Walter W. Noss**
  wnoss@scott-scott.com,efile@scott-scott.com

- **Brett D. Stecker**
  bds@weiserlawfirm.com

- **Philip James Tassin**
  ptassin@kvn.com,efiling@kvn.com,sharmison@kvn.com,sgiminez@kvn.com

- **Robert Brian Weiser**
  rw@weiserlawfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)