THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (SBN 168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile: 858/794-1450
kah@weiserlawfirm.com

Attorneys for Plaintiff Robert Berg and
[Proposed] Lead Counsel

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

ROBERT BERG, Derivatively on Behalf of
INTUITIVE SURGICAL, INC.,

                   Plaintiff,

    vs.

GARY GUTHART, MARSHALL L. MOHR,
LONNIE M. SMITH, DAVID J. ROSA,
MARK J. MELTZER, JEROME J.
MCNAMARA, AUGUSTO V. CASTELLO,
SALVATORE J. BROGNA, COLIN
MORALES, CRAIG H. BARRATT, ERIC H.
HALVORSON, AMAL M. JOHNSON, ALAN
J. LEVY, FLOYD D. LOOP, MARK J.
RUBASH and GEORGE STALK, JR.,

                   Defendants,

  – and –

INTUITIVE SURGICAL, INC.,

                 Nominal Party.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 5:14-cv-00515-EJD

DECLARATION OF BRETT D. STECKER
IN SUPPORT OF PLAINTIFF ROBERT
BERG'S MOTION TO CONSOLIDATE
RELATED ACTIONS AND APPOINT
LEAD COUNSEL

DATE:      July 11, 2014
TIME:      9:00 a.m.
CTRM:    4
JUDGE:   Hon. Edward J. Davila

Date Action Filed: 2/3/14

[Caption continued on next page.]

1

CITY OF BIRMINGHAM RELIEF AND    )   Case No. 5:14-cv-1307-EJD
2  RETIREMENT SYSTEM, Individually and  )
Derivatively on Behalf of Nominal Defendant  )
3  INTUITIVE SURGICAL, INC.,    )   Date Action Filed: 3/21/14
)
4                Plaintiff,    )
)
5         vs.    )
)
6  GARY S. GUTHART, LONNIE M. SMITH,  )
CRAIG H. BARRATT, PH.D., ERIC H.    )
7  HALVORSON, AMAL M. JOHNSON, ALAN )
J. LEVY, PH.D., FLOYD D. LOOP, M.D.,  )
8  MARK J. RUBASH, GEORGE J. STALK,  )
JR., and MARSHALL L. MOHR,    )
9                 )
Defendants,    )
10                 )
– and –    )
11                 )
INTUITIVE SURGICAL, INC.,    )
12                 )
Nominal Defendant.  )
13  _____)

14

PUBLIC SCHOOL TEACHERS' PENSION  )   Case No. 3:14-cv-01384-LB
15  AND RETIREMENT FUND OF CHICAGO,  )
)
16                Plaintiff,    )   Date Action Filed (State Court): 2/21/14
)   Date Action Removed: 3/26/14
17         vs.    )
)
18  GARY S. GUTHART, LONNIE M. SMITH,  )
ERIC H. HALVORSON, ALAN J. LEVY,  )
19  PH.D., FLOYD D. LOOP, CRAIG H.    )
BARRATT, AMAL M. JOHNSON, MARK J. )
20  RUBASH, GEORGE J. STALK, JR.,    )
MARSHALL M. MOHR, SALVATORE J.  )
21  BROGNA, AUGUSTO V. CASTELLO,    )
JEROME J. MCNAMARA, MARK    )
22  MELTZER, COLIN MORALES and DAVID )
J. ROSA,    )
23                 )
Defendants,    )
24                 )
– and –    )
25                 )
INTUITIVE SURGICAL, INC.,    )
26                 )
Nominal Defendant.  )
27  _____)

28

I, Brett D. Stecker, hereby state and declare:

1.     I am an attorney duly licensed to practice before all of the courts of the Commonwealth of Pennsylvania.  I am a partner of The Weiser Law Firm, P.C. (the "Weiser Firm"), and counsel for plaintiff Robert Berg.

2.     I submit this affidavit in support of Plaintiff Robert Berg's Motion to Consolidate Related Actions and Appoint Lead Counsel (the "Motion").  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

3.     The Weiser Firm is a national shareholder litigation firm devoted to protecting the interests of individual investors in shareholder class, derivative, and ERISA actions in state and federal courts nationwide.  The Weiser Firm has an excellent reputation in the field of shareholder litigation, and its principals have been involved in some of the most successful shareholder derivative actions in history.  The attorneys at the Weiser Firm devote a large percentage of their time to addressing corporate governance issues.  Attached as Exhibit 1 is a true and correct copy of the firm resume of the Weiser Firm.

4.     In addition to the cases cited in Exhibit 1, the Weiser Firm has served as lead or co-lead counsel in the following additional actions referenced in the Motion:  *In re TASER Int'l S'holder Derivative Litig.,* No. CV-05-123-PHX-SRB, 2006 WL 687033 (D. Ariz. Mar. 17, 2006) and *In re HQ Sustainable Maritime Indus., Inc., Derivative Litig.*, 826 F. Supp. 2d 1259 (W.D. Wash. 2011).

5.     Further, the Weiser Firm has served as plaintiffs' counsel and made significant contributions in the following actions also referenced in the Motion: *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453 (S.D.N.Y. 2010); *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477 (D.N.J. 2007); *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961

1  (D. Or. Mar. 13, 2008); *Engel v. Sexton*, 06-10447, 2009 WL 361108 (E.D. La. Feb. 11, 2009); and

2  *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006).

3          6.     The Weiser Firm has conducted a significant amount of work in investigating the

4  potential claims asserted in the above-captioned actions and has and will continue to commit

5  extensive resources necessary to zealously prosecute the actions and represent the interests of

6

7  Intuitive Surgical, Inc., the nominal defendant.

8          7.     In connection with its investigation, the Weiser Firm has obtained documents from

9  counsel for Intuitive and the other named defendants.  Counsel for Intuitive and the other named

10  defendants represented to the Weiser Firm that they provided the Weiser Firm with the very same

11  documents that were provided to counsel for plaintiff City of Birmingham Relief and Retirement

12  System ("Birmingham") pursuant to Birmingham's demand letter issued under *8 Del. C.* §220.

13

14         8.     After counsel for Birmingham filed a letter dated March 7, 2014 with the Court

15  (without first making any attempt to communicate with the Weiser Firm), I communicated with

16  counsel for Birmingham to discuss the orderly consolidation of the respective actions and a joint

17  leadership structure.  Counsel for Birmingham rejected the Weiser Firm's proposal to prosecute the

18  action jointly.

19         9.     Attached hereto as Exhibit 2 is a true and correct copy of a transcript of a January 5,

20  2010 Settlement Hearing in *Gregory v. Tuchman*, C.A. No. 3925-CC (Del. Ch.).

21

22         10.    Attached hereto as Exhibit 3 is a true and correct copy of the Declaration Of Robert

23  Berg In Support Of Berg's Motion To Consolidate Related Actions And Appoint Lead Counsel.

24         I declare under penalty of perjury under the laws of the United States of America that the

25  foregoing is true and correct.  Executed this 25th day of April, 2014, at Berwyn, Pennsylvania.

26

27         _____

28                                  BRETT D. STECKER

DECLARATION OF BRETT D. STECKER IN SUPPORT OF PLAINTIFF ROBERT BERG'S MOTION
TO CONSOLIDATE RELATED ACTIONS AND APPOINT LEAD COUNSEL - 5:14-cv-00515-EJD        - 2 -

# EXHIBIT 1

# THE WEISER LAW FIRM, P.C.

**A LEADING NATIONAL SHAREHOLDER LITIGATION FIRM DEDICATED EXCLUSIVELY TO PROTECTING INDIVIDUAL AND INSTITUTIONAL SHAREHOLDERS' INTERESTS AND PROMOTING IMPROVED CORPORATE GOVERNANCE PRACTICES**

### *FIRM BIOGRAPHY*

The Weiser Law Firm, P.C., a national shareholder litigation firm, was founded by its two principals, Patricia C. Weiser and Robert B. Weiser, in December, 2004.  Prior to December, 2004, Ms. Weiser and Mr. Weiser had both managed litigation groups at one of the nation's largest shareholder litigation firms.  The Weiser Law Firm is devoted to protecting the interests of individual and institutional investors in shareholder class, derivative and ERISA actions in state and federal courts nationwide.  The attorneys at The Weiser Law Firm devote a large percentage of their time to addressing complex corporate governance issues.

### PATRICIA C. WEISER

Ms. Weiser, a founding member of the firm, received her law degree from the Widener University School of Law in Wilmington, Delaware.  While in law school, she served as an intern for the Honorable Clarence J. Newcomer, U.S.D.J. for the Eastern District of Pennsylvania.  She is licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the Eastern District of Michigan.

Ms. Weiser's practice is focused on shareholder class action litigation challenging management misconduct in connection with corporate takeovers and disputed contests for corporate control.  Ms. Weiser participated as lead or co-lead counsel in the following notable cases where significant financial benefits were achieved for shareholders:

> *In re Atlas Energy, Inc. Shareholder Litigation (Delaware Chancery Court)* in which Class Counsel were solely responsible for an aggregate benefit to the shareholder class of more than $7 million and the additional disclosure of over forty pages of significant material information to shareholders concerning the transaction.

*In re Mediacom Communications Corp. Shareholders Litigation (Delaware Chancery Court)* in which Class Counsel were solely responsible for obtaining an aggregate benefit to the shareholder class of more than $10 million and the additional disclosure of significant material information to shareholders concerning the transaction.

*In re Storage USA Shareholder Litigation (Shelby County Chancery Court, Tennessee),* in which Class Counsel were solely responsible for an aggregate financial benefit to the class of $10.5 million in connection with the acquisition of the company by its controlling shareholder;

*In re Sodexho Marriot Shareholders Litigation (Delaware Chancery Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $166 million for members of the class, in connection with the acquisition of the company by its controlling shareholder, Sodexho Alliance, S.A.;

*In re Travelocity.com Shareholder Litigation, (Delaware Chancery Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $75 million for members of the class, in connection with the acquisition of the company by its controlling shareholder, Sabre Holdings;

*In re Delhaize America Shareholder Litigation (North Carolina Business Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $225 million for the members of the class in connection with the acquisition of the company by it controlling shareholder; and

*Lieb, et al. v. Unocal Corporation, et al. (Los Angeles Superior Court),* in which Class Counsel shared responsibility for creating a $500 million benefit via the increased consideration paid by Chevron Corp. to Unocal shareholders in the merger.  In addition, Co-Lead Counsel caused defendants to issue important additional disclosures relating to the proposed merger with Chevron prior to the shareholder vote on the merger.

In addition, the Weiser Law Firm has participated as lead or co-lead counsel in cases achieving significant therapeutic benefits to shareholders in connection with M&A transactions, including *In re Art Technology Group, Inc., Shareholders Litig.*, where Class Counsel secured a preliminary injunction in Delaware Chancery Court, enjoining the close of a $1 billion merger transaction for defendants' failure to disclose information concerning potential conflicts of interest suffered by the target company's financial advisor as a result of certain fees previously paid to that advisor by the buyer in the transaction.

In *Weigard v. Hicks, et al.*, No. 5732-VCS ("*Health Grades*"), the Weiser Firm and co-counsel successfully demonstrated to the Delaware Chancery Court that the defendants had

likely breached their fiduciary duties to the company's shareholders by failing to maximize value as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). In *Health Grades*, the Class Counsel were successful in reaching a settlement in which defendants agreed to, among other things, modify the merger agreement, including by reducing the termination fee, imposing a "majority of the minority" requirement, reducing the period of notice to the buyer before Health Grades could enter into a superior proposal, extending the tender offer so as to allow other potential bidders an opportunity to make a competing bid, as well as to create and empower an independent committee. The settlement also required Health Grades to issue a "*Fort Howard*" press release.

Moreover, at the preliminary injunction hearing in *Health Grades*, Vice Chancellor Strine "applaud[ed]" counsel for their preparation and the extraordinary high-quality of the work:

> I want to applaud the lawyers today for being so well prepared. And I particularly want to applaud the plaintiffs for being not only well prepared but exceedingly measured and logical in their argument. I really -- in a world where we all read briefs and letters and probably read e-mails to each other where I-y words are there and everybody is saying outrageous, the plaintiffs have really focused their claims -- you know, the claims they pressed in the injunction in a reasonable way. They haven't thrown hand grenades; but they've made some, frankly, very potent arguments about the reasonableness of the board's process without, frankly, making wildly speculative -- often we see sinister motives thrown around without basis. Mr. Jenkins and his team admirably really focused on the core of the matter and in a very skillful way.

Ms. Weiser was also part of the litigation team that won an injunction in the seminal Delaware Chancery Court case *In re Pure Resources Shareholder Litigation*, forcing changes to certain terms of the proposed transaction as well as the public disclosure of significant additional information concerning the transaction, and, ultimately being partially responsible for an aggregate financial benefit of approximately $41 million for the shareholder class.

### ROBERT B. WEISER

Mr. Weiser, a founding member of the firm, received his law degree from the Villanova University School of Law.  While in law school, he also served as a law clerk for the Honorable Clarence J. Newcomer, U.S.D.J. for the Eastern District of Pennsylvania.  He is licensed to

practice law in Pennsylvania and New Jersey and has been admitted to practice before the

United States District Court for the Eastern District of Pennsylvania and the United States

District Court for the District of New Jersey.  Mr. Weiser's practice is focused on shareholder

derivative litigation and ERISA class action litigation.  While employed at his prior firm, Mr.

Weiser managed the firm's shareholder derivative litigation practice, with a particular focus on

corporate governance matters.  Mr. Weiser has been involved in some of the most successful

shareholder derivative actions in the history of corporate litigation.  Over the past several years,

Mr. Weiser has been among the nationwide-leaders in prosecuting "option backdating cases" on

a derivative basis.  In addition to being among the attorneys that developed the central pleading

theory in the backdating cases (which in turn produced some of the ground-breaking decisions

in this area of law), Mr. Weiser (along with his co-counsel) successfully prosecuted backdating

cases which caused the subject corporations to cumulatively receive tens of millions of dollars in

benefits.  More recently, Mr. Weiser has launched a wave of actions that challenge the

executive compensation awarded at the nation's largest banks which received federal "bailout"

funds.  A sampling of the notable cases in which Mr. Weiser has served as lead or co-lead

counsel include:

> *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003).  Mr. Weiser
> was co-lead counsel in the Oracle action.  In that case, plaintiffs challenged
> certain multi-million dollar stock sales made by Oracle's senior officers,
> including Larry Ellison, Oracle's founder.  Oracle's board of directors appointed
> a "special litigation committee" to investigate plaintiffs' claims, and after a
> lengthy investigation, the committee moved to dismiss the case, having
> concluded that plaintiffs' claims lacked merit.  Among other things, plaintiffs'
> challenged the independence of the committee members, their good faith, and
> their ultimate conclusion.  The court denied the committee's motion, which
> allowed the action to proceed to trial.  At the time it was issued, the Oracle
> decision was one of only four reported Delaware cases where a special
> litigation committee's motion to dismiss was denied by a Delaware chancellor
> and many commentators view the Oracle case as a landmark decision for
> shareholders.  For example, the *Wall Street Journal* called the seminal
> decision "one of the most far-reaching ever on corporate governance." This
> case eventually settled for $100 million on the eve of trial.  Mr. Weiser
> believes that the $100 million recovery was the second largest derivative
> settlement ever.  The Oracle case, and its impact on corporate governance
> matters nationwide, is the subject of numerous scholarly articles and treatises.

*In re Affiliated Computer Services Derivative Litig.,* USDC for the ND of TX, No. 3:06-cv-1110.  In this option backdating action, plaintiffs challenged the stock option grants received by ACS' officers & directors over a multi-year period.  Plaintiffs in a related action purported to settle these claims for approximately $1.8 million, a paltry sum which Mr. Weiser and his co-counsel believed was far less than they were worth.  After objecting to the settlement of the related action, and engaging in a contentious discovery battle, Mr. Weiser and his co-counsel were able to materially enhance the settlement by securing a $30 million recovery for ACS.  Mr. Weiser believes that this is the largest derivative recovery in an action litigated in Texas.

*In re KB Home Derivative Litigation*, Superior Court of the State of CA, Los Angeles County, Master File No. BC355179.  Mr. Weiser was co-lead counsel in this action.  In this option backdating action, plaintiffs challenged the stock option grants received by KB Home's officers & directors over a multi-year period.  In addition to obtaining valuable corporate governance enhancements for KB, Mr. Weiser and his co-lead counsel settled this action for benefits worth at least $30 million to KB, making it one of the largest derivative settlements in the history of California corporate litigation.

*David, et al., v. Wolfen, et al.*, Superior Court of the State of CA, Orange County, Lead Case No. 01-CC-03930 (the "Broadcom Derivative Action").  Mr. Weiser was co-lead counsel in the Broadcom Derivative Action.  Like the Oracle case, the Broadcom Derivative Action was also produced a ground-breaking settlement.  In connection with the eventual settlement of the Broadcom Derivative Action, plaintiffs were able to compel Broadcom to make sweeping, substantial changes to its corporate governance practices which included a provision which allows Broadcom's shareholders to nominate directors to Broadcom's Board.  In particular, the shareholder-nominated director provision was thought to be a highly significant and unusual achievement for Broadcom's shareholders.  As the *Associated Press* reported in commenting on the settlement: "[in contrast to the Broadcom settlement] the Securities and Exchange Commission has met fierce resistance to a proposal just to allow shareholder nominations under very limited circumstances."  This type of corporate governance relief has only been achieved in a handful of shareholder derivative actions, and it became a model for corporate governance settlements that followed.

*Barry v. Cotsakos*, CV 49084 (San Mateo County, CA) (the "Etrade Derivative Litigation").  Mr. Weiser was co-lead counsel in the Etrade Derivative Litigation.  Mr. Weiser believes that the Etrade Derivative Litigation is one of the most successful executive compensation cases ever brought against a publicly traded corporation's board of directors.  In that case, the plaintiff challenged the payment of excessive compensation awarded to Etrade's then-current Chief Executive Officer.  As a result of the settlement of the case, Etrade's Chief Executive Officer returned approximately $25 million to the Company, and he also agreed to forego other valuable financial benefits.  The Etrade settlement also provided for sweeping changes to the company's corporate governance practices and the structure of its Board.  These measures, and the resulting change in the public's perception of Etrade, were

profiled in a September 8, 2003 *Wall Street Journal* article entitled "How One Firm Uses Strict Governance To Fix Its Troubles."  Since the time of the Etrade settlement, Etrade added independent directors to its Board, who have since forced out the company's Chief Executive Officer.  In response to these changes, the Company's stock increased more than 300% in the 18 months following the settlement and the "new" Etrade was the subject of several positive media reports.

*Klotz v. Parfet, et al.*, Case No. 03-06483-CK (In the Circuit Court of Jackson County, Michigan) (the "CMS Derivative Litigation").  Mr. Weiser was co-lead counsel in the CMS Derivative Litigation.  In that case, plaintiff alleged that CMS' Board of Directors failed to develop and implement adequate corporate governance practices and internal controls.  Plaintiff alleged that the Board's internal control failures caused the Company to suffer enormous damages to its reputation and prestige.  In settling the CMS Derivative Litigation, the Weiser Firm was able to recover $12 million for the Company, and the Board agreed to adopt what one commentator called "some of the most substantial corporate governance reforms" ever undertaken by a publicly traded corporation.  Mr. Weiser believes that the CMS derivative settlement is the largest in the history of Michigan corporate litigation.

*Gebhardt v. Allumbaugh, et al.,* Case No. 2002-13602 (Harris County, Texas)(the "El Paso Derivative Litigation").  Mr. Weiser was lead counsel in the El Paso Derivative Litigation.  This action centered on the Company's alleged anti-competitive conduct in California during that the state's energy crisis of 2001-02.  In addition to making sweeping changes to the Board's structure and the Company's corporate governance practices, Mr. Weiser was able to secure a $16.75 million recovery for the Company.  Mr. Weiser believes that the El Paso Derivative Litigation was either the first or second largest derivative settlement in Texas history at the time it was agreed to.

*Eliasoph v. Johnson*, C.A. No. 05-CVS-3698 (North Carolina General Civil Litigation Court)(the "SPX Derivative Litigation").  Mr. Weiser was lead counsel in the SPX Derivative Litigation.  Like the Etrade Derivative Litigation, Mr. Weiser believes that the SPX Derivative Litigation is among the most successful executive compensation cases ever brought against a publicly traded corporation's board of directors.  In this case, the plaintiff challenged the fairness of the Company's entire executive compensation structure.  In connection with the settlement of the SPX action, the Company's board of directors agreed to adopt a new executive compensation plan which was designed in part, with plaintiff's counsel and her expert.   The new compensation plan more closely aligned shareholder and management interests and it was estimated that the new plan would save the Company at least $25 million.

*In Re Staples, Inc. Shareholders Litigation*, 792 A.2d 934 (Del. Ch. June 5, 2001).  Mr. Weiser was one of three lead counsel in the Staples action.  In that case, plaintiffs secured a financial benefit worth at least $12 million to Staples by winning an injunction preventing Staples from holding a shareholder vote on an improperly disclosed recapitalization plan that would have unfairly

benefitted Staples' insiders at the expense of the Company and its stockholders.

*Wanstrath v. Doctor R. Crants, et al.*, C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999)(the "Prison Realty Derivative Litigation"). In the Prison Realty Derivative Litigation, plaintiff challenged the transfer of assets from Prison Realty to a private entity owned and controlled by several of the Company's top executives. Plaintiffs also alleged that the proposed transaction would have crippled the Company's liquidity. Plaintiffs were able to halt the planned transaction, which prevented the Company from suffering a $120 million loss, which was a highly significant victory in light of the Company's then-precarious financial position. As a result of the settlement of the case, the members of the Company's top management were removed, the composition of the Board of Directors was significantly altered and important corporate governance provisions were also put in place to prevent future abuse. Notably, all of these corporate benefits occurred at a time when the Company was facing near-certain bankruptcy which would have wiped out shareholders' equity in the Company. Because the Company had adopted these significant changes, it was able to renegotiate the terms of its credit facility with its lenders and it never had to file for bankruptcy protection. Since the time the case was settled, the Company's new management has led the Company, now-named Corrections Corporation of America, to profitability, and the price of the common stock increased more than 400% in the two years following the settlement.

*Huscher v. Curley, et. al.*, No. 00 Civ. 21379 (Mich. Cir. Ct., 2000) (the "Sotheby's Derivative Litigation"). In the Sotheby's Derivative Litigation, plaintiffs alleged that the Company's Chief Executive Officer had entered into illegal price-fixing agreements with the Company's leading purported competitor, Christie's International PLC. As a result of the settlement of this case, the Company received the return of certain monetary benefits which had been provided to the Chief Executive Officer that were worth approximately $12 million to the Company. In addition, significant changes in the Company's top management and Board of Directors were achieved in conjunction with the settlement of the case.

Mr. Weiser has been a frequent commentator on corporate governance matters and has lectured on corporate governance issues in both this country and abroad.

## **BRETT D. STECKER**

Mr. Stecker is a graduate of Franklin & Marshall College and of Villanova University School of Law. While in college, Mr. Stecker earned a B.A. in Government and served as a legislative intern for United States Senator Alfonse M. D'Amato. While in law school, Mr. Stecker served as an Executive Member of the Moot Court Board and represented Villanova in national competitions. Upon graduation from law school, Mr. Stecker was an associate with the Litigation Department of

Blank Rome LLP in Philadelphia, PA.  After two years at that firm, Mr. Stecker moved to Weir &

Partners, LLP, a boutique commercial litigation firm in Philadelphia, where he focused his practice

on banking litigation in cases dealing with consumer lending, check fraud, and the enforcement of

guarantee and other security agreements.  At The Weiser Law Firm, Mr. Stecker concentrates his

practice on shareholder derivative and ERISA litigation.

### JEFFREY J. CIARLANTO

Mr. Ciarlanto is a graduate of The Pennsylvania State University and Villanova University

School of Law.  While in college, Mr. Ciarlanto earned Bachelor of Arts degrees in Economics and

Political Science and graduated with honors.  During law school, Mr. Ciarlanto served as the

Business Editor of Villanova Law's Sports and Entertainment Law Journal.  Mr. Ciarlanto also

served as a judicial extern for the Honorable Matthew D. Carrafiello of the Philadelphia Court of

Common Pleas.  Mr. Ciarlanto is licensed to practice law in Pennsylvania and New Jersey.  Prior to

joining The Weiser Law Firm, Mr. Ciarlanto was an associate at Marks, O'Neill, O'Brien &

Courtney, P.C., where he focused his practice on labor and employment law.  At The Weiser Law

Firm, Mr. Ciarlanto concentrates his practice on shareholder derivative and ERISA litigation.

### KATHLEEN A. HERKENHOFF

Ms. Herkenhoff joined The Weiser Law Firm in January 2010, opening the firm's San Diego,

California office. As detailed below, Ms. Herkenhoff has been exclusively litigating securities

actions for 16 years, first at the Securities and Exchange Commission ("SEC") and most recently

as a Partner at Coughlin Stoia Geller Rudman & Robbins LLP in San Diego.  Ms. Herkenhoff

earned her Bachelor of Arts degree in English Literature from the University of California (Berkeley)

in 1989. She earned her Juris Doctor degree from Pepperdine University School of Law in 1993,

where she was on the Dean's Honor List and received American Jurisprudence Awards in both

Constitutional Law and Agency-Partnership. Following law school, Ms. Herkenhoff worked at the

SEC's Los Angeles office, investigating and prosecuting complex securities fraud and insider

trading actions.

In 1997, Ms. Herkenhoff joined Milberg Weiss Bershad Hynes & Lerach LLP in Los Angeles, California, and ultimately moved to the firm's San Diego office, where she served as a Partner from 2002 to 2009 (the San Diego office became known as Coughlin Stoia). Over the past 12 years at Coughlin Stoia, Ms. Herkenhoff has practiced in all areas of securities class and derivative litigation, working tirelessly to achieve nearly one billion in settlement recoveries for victimized shareholders. Many of these settlements also include sweeping corporate governance improvements negotiated by Ms. Herkenhoff. A sample of notable settlements includes:

- *$618 million in opt-out litigation against AOL Time Warner, Inc.*

- *$122 million in class action against Mattel, Inc.*

- *$100 million in class action against Honeywell International, Inc.*

- *$30+ million in derivative stock option backdating cases*

Ms. Herkenhoff continues her nearly two decades of securities litigation experience by joining the firm's extensive M&A and derivative practice groups.  Ms. Herkenhoff is licensed to practice law in all California state and federal courts, as well as in the District of Colorado.

### JOSEPH M. PROFY

Mr. Profy is a 1991 graduate of the University of Notre Dame and earned his Juris Doctor degree *Cum Laude* from the Dickinson School of Law in 1995.  He is licensed to practice law in the Commonwealth of Pennsylvania and the State of New Jersey and has been admitted to practice in the United States District Court for Eastern District of Pennsylvania, The Third Circuit Court of Appeals and the United States Supreme Court.  From 1995 to 1997, Mr. Profy served as a law clerk to the Honorable John P. Fullam, United States District Court for the Eastern District of Pennsylvania. From 1997 to 2002, Mr. Profy was an associate with Reed Smith LLP.  In 2002, Mr. Profy joined Blank Rome LLP as an associate and in 2006 he was elevated to partner at Blank Rome LLP.  In June of 2011, Mr. Profy joined the Weiser Law Firm.

### JAMES M. FICARO

Mr. Ficaro earned his Bachelor's of Business Administration in Finance from the McCombs School of Business at the University of Texas at Austin and earned his Master of Public Policy from George Mason University.  Mr. Ficaro graduated with a J.D. from Temple University's Beasley School of Law, where he was a member of the Moot Court Honor Society and served on the Editorial Board of the Political and Civil Rights Law Review.

Prior to joining the Weiser Law Firm, Mr. Ficaro spent nearly five years in the financial services industry, most recently as an associate at Janney Montgomery Scott LLC.  At The Weiser Law Firm, Mr. Ficaro litigates a broad range of securities class actions, including corporate mergers, acquisitions and buyouts in state and federal courts across the country.  Mr. Ficaro is licensed to practice law in Pennsylvania and New Jersey and holds the Series 7 & 66 FINRA securities licenses.

### DAVID M. PROMISLOFF

Mr. Promisloff received his law degree from the University of Michigan in 2005.  While in law school, he served as an associate editor of the Michigan Telecommunications and Technology Law Review.  Mr. Promisloff received his undergraduate degree from Emory University in 2002, double majoring in political science and history.  As part of his undergraduate studies, Mr. Promisloff attended the University of New South Wales in Sydney, Australia.  Prior to joining The Weiser Law Firm, Mr. Promisloff worked in the start-up and lead plaintiff departments at Kessler Topaz Meltzer & Check.  Mr. Promisloff began his legal career at Sheller, P.C., specializing in mass tort cases.  Mr. Promisloff is licensed to practice in Pennsylvania, and his admitted to practice in the Eastern District of Pennsylvania.

### CHRISTOPHER L. NELSON

Mr. Nelson, of counsel to the firm, received his J.D. from Duke University School of Law, and his B.S. from Washington University in St. Louis. He is licensed to practice law in Pennsylvania and is admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the 2d, 3d, 4th, 5th, 9th, 10th, and 11th Circuits, and the United States

District Court for the Eastern District of Pennsylvania.

Mr. Nelson's practice focuses on securities class action litigation, civil appellate litigation, and broker/dealer arbitration before the Financial Industry Regulatory Authority.  Prior to joining the Weiser Law Firm, Mr. Nelson was a partner at Kessler Topaz Meltzer & Check LLP.

Mr. Nelson has been lead or co-lead counsel for the plaintiffs in some of the largest securities class actions in history, including:

- In re Wachovia Preferred Securities and Bond/Notes Litig., No. 09-Civ. 6351 (S.D.N.Y.).  Co-lead counsel, prosecuted case through discovery.  $627 million recovery.

- In re Satyam Computer Servs., Ltd. Sec. Litig., No. 09 MD 02027 (S.D.N.Y.).  Co-lead counsel, prosecuted case through discovery.  $125 million recovery.

- Johnson v. Aljian, 394 F. Supp. 2d 1184 (C.D. Cal. 2004), aff'd, 490 F.3d 778 (9th Cir. 2007), cert. denied, No. 07-767, 2008 U.S. LEXIS 2481 (U.S. Mar. 17, 2008).  Lead counsel. Drafted complaint in multi-million dollar insider trading case against Kirk Kerkorian and Tracinda Corporation using novel theory under Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1.  Successfully drafted and argued opposition to defendants' motion to dismiss. Successfully drafted and argued opposition to defendants' appeal.  Defeated defendants' petition for writ of certiorari.  Class certified February 13, 2009, over defendants' opposition.  $8.1 million recovery.

- Safron Capital Corp. v. Leadis Tech., Inc. (In re Leadis Tech. Inc. Sec. Litig.), No. 06-15623, 274 Fed. Appx. 540; 2008 U.S. App. LEXIS 8699 (9th Cir. 2008), cert. denied, 2009 U.S. LEXIS 1778 (U.S. Mar. 6, 2009).  Lead counsel, successfully appealed decision of District Court granting motion to dismiss. $4.2 million recovery.

- Cent. Laborers Pension Fund v. Merix Corp. (In re Merix Corp. Sec. Litig.), No. 06-35894, 275 Fed. Appx. 599; 2008 U.S. App. LEXIS 9073 (9th Cir. 2008), cert. denied, 2008 U.S. LEXIS 9162 (U.S. Dec. 15, 2008).  Lead counsel, successfully appealed decision of District Court granting motion to dismiss. Drafted and successfully argued motion for class certification.  $2.5 million recovery.

- Kaltman v. Key Energy Servs. (In re Key Energy Sec. Litig.), 447 F. Supp. 2d 648 (W.D. Tex. 2006).  Lead counsel.  Drafted and argued opposition to motion to dismiss, prosecuted case through discovery and argued class certification, and led negotiations.  $15.4 million recovery.

- In re Martek Biosciences Sec. Litig., No. MJG-05-1224 (D. Md. June 14, 2006). Co-lead counsel.  Drafted and argued opposition to motion to dismiss, prosecuted case through discovery, secured certification of plaintiff class, and led negotiations.  $6 million recovery.

Mr. Nelson has an active pro bono practice focused on family law, and serves on the Board of Advisors for the Jennersville Branch of the YMCA of the Brandywine Valley.

# EXHIBIT 2

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SUSAN M. GREGORY,                     :
                                      :
                Plaintiff,            :
                                      :
          vs.                         :    Civil Action
                                      :    No. 3925-CC
KENNETH D. TUCHMAN, JAMES E.          :
BARLETT, WILLIAM A.                   :
LINNENBRINGER, RUTH C. LIPPER,        :
SHRIKANT MEHTA, SHIRLEY YOUNG,        :
ROD DAMMEYER, GEORGE C.               :
HEILMEIER, JOHN T. MCLENNAN,          :
MORTON MEYERSON, ALAN                 :
SILVERMAN, MARK C. THOMPSON,          :
SHARON A. O'LEARY, DENNIS J.          :
LACEY, JOHN SIMON, ALAN               :
SCHUTZMAN, BRIAN DELANEY, JOHN        :
TROKA, LARRY KESSLER, MICHAEL         :
E. FOSS and MARGOT O'DELL,            :
                                      :
                Defendants,           :
                                      :
          and                         :
TELETECH HOLDINGS, INC.,              :
                                      :
             Nominal Defendant. :
                             - - -
                             Chancery Court
                             34 The Circle
                             Georgetown, Delaware
                             Tuesday, January 5, 2010
                             2:30 p.m.


                             - - -

BEFORE:  HON.  WILLIAM B. CHANDLER III, CHANCELLOR.

                    - - -
               SETTLEMENT HEARING
                    - - -

-----------------------------------------------------------
               CHANCERY COURT REPORTERS
                  410 Federal Street
          Dover, Delaware 19901 (302) 739-3934

2

```
 1   APPEARANCES:
     (By telephone):
 2
              NORMAN M. MONHAIT, ESQ.
 3            Rosenthal, Monhait & Goddess, P.A.
                      -and-
 4            ROBERT B. WEISER, ESQ.
              BRETT D. STECKER, ESQ.
 5            JEFFREY J. CIARLANTO, ESQ.
              of the Pennsylvania bar
 6            The Weiser Law Firm, P.C.
                      -and-
 7            KIP B. SHUMAN, ESQ.
              of the Colorado bar
 8            The Shuman Law Firm
                for Plaintiff
 9

10            BROCK E. CZESCHIN, EQ.
              Richards, Layton & Finger, P.A.
11                    -and-
              TIMOTHY R. BEYER, ESQ.
12            of the Colorado bar
              Brownstein, Hyatt, Farber, Schreck
13              for Defendants Kenneth D. Tuchman, James
                Barlett, Rod Dammeyer, George Heilmeier,
14              John McLennan, Morton Meyerson, Alan
                Silverman, Mark Thompson, Sharon O'Leary,
15              Dennis Lacey, John Simon, Alan Schutzman,
                Brian Delaney, John Troka, Larry Kessler,
16              Michael Foss Margot O'Dell and Nominal
                Defendant TeleTech Holdings, Inc.
17                    -and-
              GEOFFREY H. COLL, ESQ.
18            Dewey & LeBoeuf, LLP
                for Nominal Defendant
19

20

21
                              -  -  -
22

23

24
```

CHANCERY  COURT  REPORTERS

1          THE COURT:  Good afternoon, counsel.

2   Do you have any trouble hearing me?

3          MR. MONHAIT:  No.  I hear you fine.

4   Can others hear the Chancellor?

5          THE COURT:  All right.  I have you on

6   speaker phone.  I am in the courtroom, and the only

7   person present in the courtroom besides my clerk and

8   my staff is a member of the press, Jeff Feely, and

9   there is no one else here.  It is past the hour of

10  2:30 at which this settlement hearing was scheduled,

11  which is Gregory versus Tuchman, et al, Civil Action

12  Number 3925.

13          So if there are introductions, please

14  feel free to do that.  If not, whoever is going to

15  present the settlement to me should feel free to

16  begin.

17          MR. MONHAIT:  Your Honor, good

18  afternoon.  This is Norm Monhait.  Thank you very much

19  for agreeing to conduct this hearing by phone.

20          I have on the line with me Robert

21  Weiser and Kip Shuman who have been the principal

22  counsel on behalf of the plaintiff in this action, and

23  Mr. Weiser will be speaking in support of the

24  settlement.  Your Honor has granted his pro hac vice

4

1   motion this morning.

2                    THE COURT:  Very well then.

3   Mr. Weiser, where are you?  Are you in New York or

4   here in Wilmington?

5                    MR. WEISER:  Neither, Your Honor.  I

6   am in Wayne, Pennsylvania which is one of the western

7   suburbs of Philadelphia.

8                    THE COURT:  I'm sorry.  I now look and

9   see that your office is in Wayne.  My apologies.

10                    MR. WEISER:  None needed.

11                    MR. CZESCHIN:  Brock Czeschin from

12   Richards, Layton on behalf of the defendants, and I

13   have on the phone Geoffrey Coll from Dewey & LeBoeuf

14   representing the nominal defendant Teletech, and

15   Mr. Timothy Beyer of Brownstein, Hyatt, Farber,

16   Schreck in Denver who represents all the individual

17   defendants other than Mr. Tuchman.

18                    THE COURT:  Very well then.  Welcome

19   to all.  I'm glad you're able to make it by telephone.

20   Hopefully that is a little more convenient for all.

21                    MR. MONHAIT:  It is, thank you.

22                    MR. WEISER:  Your Honor, thank you.

23                    As Your Honor knows, we are here on a

24   final unopposed motion for final settlement approval.

5

1   Pursuant to the Court's hearing order, more than
2   13,000 individual notices were mailed to potential and
3   actual Teletech stockholders.  In addition, Teletech
4   posted notice of the settlement on its website, and we
5   have yet to receive any objections, and I understand
6   from Your Honor that there are no objectors in court
7   today.
8              On December 28th, the moving plaintiff
9   had filed papers in support of the settlement.
10  Included with those papers was an affidavit that I
11  executed.  My affidavit, in large part, deals with the
12  factual background of the action along with
13  plaintiff's rationale for settling the case on the
14  terms it did at the time it did.
15             I assume the Court's general
16  familiarity with our papers which were somewhat
17  lengthy, and for that, I apologize, but we wanted to
18  give the Court as best a record as we could to
19  evaluate the proposed settlement.
20             I also know Your Honor is quite
21  familiar with option backdating issues generally, both
22  in context of settlement or at motion to dismiss, so I
23  know the Court is quite familiar with these issues as
24  a general matter.

1                    So what I would prefer to do, if

2      possible, is kind of provide the Court with an

3      overview of why we settled the case for what we did

4      when we did as opposed to regurgitating our lengthy

5      papers.  Would that be sufficient, Your Honor?

6                    THE COURT:  Absolutely.

7                    MR. WEISER:  One thing in kind of

8      going back through the record that struck me is we

9      filed this complaint in July of 2008, and we actually

10     had the mediation in December 2008.  Although the

11     action didn't settle at the mediation, it struck me,

12     as I was looking back at this, that that's a

13     relatively short time period between initiating a case

14     and going to mediation.

15                    One of the things I wanted to make

16     clear to the Court is particularly in the time leading

17     up to our filing and the investigation we conducted,

18     plaintiff was in no hurry to settle this case.  We

19     believed that we had very strong claims, some of which

20     were novel in nature, and I'm specifically referring

21     to what we called excess grant claims.

22                    I will tell the Court candidly I have

23     been itching to litigate a Sanders-type claim

24     virtually since that decision was entered, and I

1  thought we had one here.

2            But, over time, it became quite

3  apparent to us, through an information exchange with

4  defendants, that while we may have had a Sanders

5  claim, I think it would be fair to say that we did not

6  have the claim that we thought we had.  Frankly, I

7  think one of the reasons why we were able to start

8  discussing the case as quickly as we did was it was

9  filed after a time that Your Honor's Ryan opinion,

10  perhaps even the second Ryan opinion, was published.

11            And I think that those opinions,

12  frankly, provided parties with a lot of guidance as to

13  the issues to consider in prosecuting one of these

14  cases.  I think that's one of the reasons why we were

15  able to kind of get started so quickly.

16            Here's what I would say as an

17  overview.  Based on everything that we have seen and

18  done, which includes our own statistical modeling,

19  some of Your Honor's opinions, some other court

20  opinions, the evidentiary record in the case and

21  numerous conversations with company counsel, our

22  overall impression is that Teletech suffered from a

23  number of different internal control issues during the

24  relevant period with respect to its option dating

1   practices.

2              The record is very clear that lower

3   level personnel at Teletech in what they called, I

4   believe, their human resources, maybe their human

5   capital department I believe is what they called it,

6   probably were not adequately trained, did not

7   understand a lot of the legal issues with respect to

8   option dating and pricing and the documents relating

9   to those issues.  We don't see any indicia of fraud or

10  an intent to deceive on any of the claims in the case

11  or on any of the underlying facts in the case.

12             We wrote about this a bit in the

13  papers, but it has been quite unique, in my

14  experience, to kind of go through and see a wave of

15  similar cases, all of which were launched at roughly

16  the same time, and I do think it provided us some

17  unique insight, because we were able to see the option

18  granting documents at literally scores of companies.

19             And what was remarkable about the

20  documents is that, in large part, they were largely

21  similar from company to company.  In some ways, it

22  made it much easier to spot something -- to spot a

23  situation where it appeared as though a named

24  defendant was trying to illicitly take advantage of an

1   option grant.

2               We didn't see any of that here, nor

3   specifically with respect to the backdating claims.

4   Although, as the company acknowledged, there were some

5   options that were picked with hindsight.  Once again,

6   it does not appear, based on the evidentiary record,

7   and, frankly, the statistical analysis, that that was

8   done so to take advantage of the company or its

9   stockholders.

10              For example, we wrote about this in

11  our papers, although there were low prices selected,

12  whoever was ultimately selecting the option dates, or

13  by the time the option dates actually got finally

14  entered, those low prices almost never coincided with

15  yearly, monthly or quarterly lows or any of these

16  other Merrill Lynch type indicia of backdating.

17              I will tell the Court candidly that I

18  believe the backdating claims here are weak.  To us,

19  the excess grant claims were much more interesting and

20  probably a more viable claim.  I am also quite certain

21  that to the extent that the company suffered non-

22  exculpable damages relating to any of this conduct,

23  that those damages stem from what we term the excess

24  grant claims.

1     We spent a considerable amount of time

2 analyzing Sanders and the facts at issue here.  It is

3 our impression that while this seems to share some

4 characteristics with Sanders, I wouldn't go so far to

5 say it's on all fours with the Sanders case.

6     There are a couple of critical

7 distinctions between the excess claims here and

8 Sanders.  For one thing, we have actually three

9 separate exercise grant claims, two of which are

10 almost certainly time barred because they occurred

11 back in 2001 and 2002.

12     There was a 2005 excess grant claim,

13 but what the Court would have done with that claim

14 would have been hard to say.  I don't mind saying that

15 part of me felt like it would have been fun to

16 litigate that claim with Your Honor, and it certainly

17 would have been interesting.

18     Here, unlike Sanders, it appears as

19 though the board did have the ability to amend the

20 plan.  Also, unlike Sanders, the company did not

21 exceed the annual limit set forth in the plan on an

22 enterprise-wide basis.  Instead, they exceeded the

23 limit to an individual recipient.

24     These are small distinctions but

1  perhaps they're important.  You know, there's language

2  in the plan that basically says that the company, or

3  the compensation committee, can amend the terms of the

4  plan consistent with all applicable laws, rules,

5  regulations and NASDAQ rules.

6          We would have taken the position that,

7  you know, amending consistent with applicable laws

8  would have included Delaware law and Sanders.  Whether

9  the Court would have accepted that, we don't know.

10          I think there was value in that claim,

11  potential value, but I think we captured a lot of it.

12  According to our expert's analysis, that claim was

13  worth approximately $6 million, and as Your Honor

14  knows, the total value of the settlement here is

15  6.5 million.

16          In my own mind, I always considered

17  the monetary payment to the company here largely for

18  the excess grant claim.  I think the important thing,

19  and I'll try to move along a little bit faster, is the

20  idea that even if we believe the claim was stronger,

21  and I really did think it was on all fours with

22  Sanders, the practical realities of proceeding far,

23  far outweighed continued litigation of this matter.

24  And we wrote about this both in our brief and in our

12

1    affidavit.

2                    For example, if those options were

3    ever exercised, perhaps we would have viewed this

4    differently.  But they weren't.  In fact, every single

5    option grant we challenged in the case, be it an

6    alleged backdated grant or excess grant, not one

7    single one of those grants was ever exercised.

8                    To the extent that there were

9    mispriced grants to defendants, all those grants were

10   repriced after we commenced the action, and that

11   process started right before we filed.

12                   So, sitting here today, there is no

13   officer or director at Teletech that's sitting on any

14   mispriced grants.  So if you have a situation where,

15   even if you have liability-producing conduct, there

16   were very serious questions about whether the company

17   was actually damaged by this conduct.

18                   I understand that under Sanders the

19   remedy would be rescission.  So perhaps that does

20   change the damage calculus slightly, but in light of

21   the fact that it was very difficult -- it would have

22   been very difficult to prove that any of the

23   individual defendants actually benefited from any of

24   the challenged grants.

1          Absent the rescission claim, I think

2    that would have made it very difficult to prove

3    damages in the case.  And as the Court is aware, and

4    we wrote about this in our brief too, as far as we are

5    aware, there is not an accepted methodology for

6    proving damages in a case like this.  But in light of

7    the fact that there were no exercises with respect to

8    challenged grants, whatever the damage number is here,

9    it's small.  It could well be seven figures small.

10          According to our expert's analysis,

11   the total theoretical damages in the whole case, using

12   a Black-Scholes type analysis, which is an assumption,

13   admittedly, would be seven or $8 million.  In the

14   context of the types of cases that we typically

15   pursue, that would be a pretty small number.  Not to

16   mention the cost and time it would take for the

17   company to defend those claims or to advance costs on

18   behalf of the defendants.

19          So I think to kind of sum up with

20   respect to settlement, I think there is a fair chance,

21   if not a good chance, that we could have won a demand

22   futility motion in the action.  But we also believe

23   that we faced all kinds of legal and practical

24   challenges in going forward.  I'll confess the legal

1  challenges are something that we handle and we address

2  every day.  The practicalities here, I will say, were

3  very, very persuasive to us, maybe more so than most

4  cases.

5              Your Honor, I would be happy to

6  discuss some of the nature of the claims and the

7  defenses or some of the specific demand futility

8  issues we would have confronted here if Your Honor

9  wants to hear about some of those issues.  If not, I

10  would like to move on and discuss the fee for a couple

11  of minutes.

12              THE COURT:  Actually, Mr. Weiser,

13  that's fine.  I do have one sort of technical question

14  about one of the benefits that you achieved in the

15  settlement.

16              MR. WEISER:  Sure.

17              THE COURT:  It may be just that I have

18  misread your brief, but on page 14 of your brief, you

19  have one of the therapeutic corporate governance

20  measures that has been agreed to, as I think I read it

21  correctly, as providing for an independent

22  compensation committee, a compensation committee that

23  is composed of all independent members.

24              MR. WEISER:  Correct.

1          THE COURT:  But then I thought I read

2    to the contrary on page 19 of your brief, the majority

3    of the compensation committee members would have to be

4    independent.  I didn't know whether I just misread it

5    or which one is the correct version.

6          MR. WEISER:  Well, what I would say --

7    and I apologize for that error, Your Honor.  What I

8    would say is if you're looking at page 14 of the

9    brief, that's lifted directly from the stipulation of

10   settlement, which, as the Court knows, is the

11   operative document here.  And I'm happy to take a look

12   at this for a minute and try to sort this out.  But if

13   you're looking at page 14 of the brief, that's right

14   out of the stipulation.

15          THE COURT:  That's exactly what I read

16   first, and in the middle paragraph on page 19 where

17   the language is that sort of confused me appeared, it

18   says that the company has added a new independent

19   director, and the majority of the members of the

20   compensation committee shall now be independent

21   directors.

22          I didn't know whether that was in

23   conflict with what the stipulation is, but in any

24   case, as you say, and as I accept, whatever is in the

1   stipulation and the language on page 14 is lifted from

2   that, so that would be the operative and governing

3   language.

4                  MR. COLL:  This is Geoff Coll on

5   behalf of the company.  The language on 14 is correct,

6   and the compensation committee is now and shall be,

7   going forward, comprised entirely of independent

8   directors.

9                  THE COURT:  Thank you very much,

10  Mr. Coll.

11                 I don't have any other questions about

12  what I'll call the legal issues and the settlement,

13  Mr. Weiser, so if you want to move to the fee

14  application, you can.

15                 MR. WEISER:  Sure.  As Your Honor

16  knows, and this is set forth in our papers, we did

17  negotiate an agreed-to fee award here after the terms

18  of settlement had been reached.  The agreed-to fee is

19  $1.5 million.  I will tell you that Judge Weinstein

20  who was the mediator in this matter who I believe Your

21  Honor is familiar with --

22                 THE COURT:  Yes.

23                 MR. WEISER:  -- negotiated this fee,

24  played a critical role, I would say, in negotiating

1   this fee.

2              One thing that did kind of happen here

3   that probably ran to everybody's benefit is by the

4   time we actually were negotiating the fee here, there

5   had become or developed a full body of case law

6   regarding fees in these backdating cases.  I think it

7   was very beneficial to us, because what we were able

8   to do is kind of take a look at the settlement and the

9   relief and the amount of time and effort we had put

10  into the case and compare it with those of numerous

11  other cases.

12             As Your Honor may know, many of these

13  backdating cases have settled.  So I think that

14  background and Judge Weinstein's role, not only in

15  mediating this dispute, but mediating many, many of

16  the backdating cases, gave him a lot of insight into

17  what an appropriate and fair fee would be here.

18             As we set forth in our papers, the

19  $1.5 million represents about 23 percent of the total

20  benefit to the company which is $6.5 million.  I think

21  we wrote about this, I think it's in the -- it's

22  either in our brief or my affidavit, the $1.5 million

23  fee took about 1100 hours to produce the result in

24  this case.

1           At 1.5 million, less about $50,000 for

2    expenses, that equates to a multiplier of about three,

3    a sniff over three.  One thing I did want -- one item

4    I did want to bring to the Court's attention, because,

5    frankly, we weren't sure how to handle it, so we

6    decided to take the most conservative approach

7    possible, we did hire some temporary attorneys in

8    connection with reviewing the company's document

9    production here.

10          Of course, we paid those attorneys out

11   of our pocket at the time those expenses were

12   incurred.  But we did not include those expenses in

13   our expense figure, nor did we account for their

14   attorney time, which was fairly significant.  In other

15   words, we basically, for the purposes of making the

16   fee application, we basically acted as if the temp

17   time and expense, the attorney temp time and expense

18   had never occurred.

19          As Your Honor knows, the governing

20   standard for fees in Delaware courts is the so-called

21   Sugarland test.  I think we come out very well on the

22   Sugarland test no matter what factors the Court would

23   choose to emphasize.

24          Clearly, under Sugarland and its

1    progeny, the most important item in assessing an

2    appropriate attorney's fee is the success in the case.

3    I think we score very well on that count.  I do have

4    theories, putting aside the legal issues surrounding

5    what you would have to prove to prove not exculpated

6    damages in this case, I feel quite confident that the

7    damages are, I don't know, less than ten, $12 million,

8    the direct damages are less than ten, 12 million bucks

9    in the whole case.

10                I think it could very well be that the

11   damages here at trial would be eight, seven,

12   $6 million.  Whether it's 12 or six, I think we

13   recovered a significant monetary -- we secured a

14   significant monetary contribution, and the governance

15   here is valuable too.

16                I would candidly acknowledge to the

17   Court that I have done other derivative settlements

18   where the governance was kind of more far reaching or

19   touched upon more areas.  Having said that, getting

20   what we got here was significant, and it was quite

21   difficult to achieve, mostly because of the company's

22   majority stockholder.

23                I think one can make the argument that

24   when you buy a company that's majority led, when a

1    stockholder buys a company that's majority led, that

2    to some degree, it kind of -- you kind of get what

3    you're paying for.  I think here we developed a

4    package that's small but significant because it

5    appropriately balances the interests of the company's

6    minority stockholders and the majority stockholder.

7                     I do think Teletech is a much better

8    company today than it was previously.  Teletech, along

9    with every other company in the universe, I don't

10   think is ever going to backdate an option again.  So,

11   in some ways, the option timing dating prong of this

12   was easier.  But the other therapeutics were more

13   difficult to achieve, and they required some creative

14   thinking and some diligence on behalf of the parties.

15                     Frankly, I think Teletech is to be

16   commended for kind of opening up its governance,

17   adding independent directors to the board, agreeing to

18   some other measures which, to us, make the company

19   more stockholder friendly and make the directors more

20   responsive.

21                     So, as Your Honor knows, it's

22   difficult to quantify governance measures, but the

23   Court is also aware, and plaintiffs are certainly

24   aware, that a single therapeutic or a single

1  disclosure can sometimes produce a fee of half a

2  million or a million dollars in Delaware alone if that

3  therapeutic is, indeed, material or critical, or

4  whatever adjective you would choose to use.  So I'm

5  not trying to put a dollar value on our therapeutics

6  here.  But I wanted to stress to the Court that we

7  believe them to be valuable.

8              I think the Court should take that

9  into consideration in granting our application in

10  whole or in part.

11             Unless the Court has any specific

12  questions on the fee application --

13             THE COURT:  The only question,

14  Mr. Weiser, and I think I know the answer, the

15  1.5 million is an all-in fee, all inclusive, is that

16  correct?

17             MR. WEISER:  That's correct.

18             THE COURT:  You're also asking for

19  $2500 for Susan Gregory.

20             MR. WEISER:  Yes.  I can talk about

21  that for a minute if you like.

22             THE COURT:  A minute will be plenty.

23             MR. WEISER:  I do think that there is

24  a long line of cases from Delaware and other

1    jurisdictions that support the notion that an engaged,

2    well-meaning plaintiff should be incentivized to step

3    forward in cases like this.  That's what Miss Gregory

4    did.

5              The one thing I would note is that

6    she's owned these shares for a long time, since 1996,

7    but she held her shares through a very choppy market

8    last year.  I'm not saying that Mrs. Gregory would

9    have sold her stock, and in fact, by not selling it,

10   it, in fact, benefited her.  Teletech stock has

11   probably doubled roughly in value over the last year.

12   But, of course, nobody knew that last October when the

13   world was coming to an end.

14             Miss Gregory does not have significant

15   time in the case.  She was not deposed.  But we were

16   quite involved in talking with her about the various

17   points in the case, and I think, at the end of the

18   day, she certainly added value to this enterprise

19   because, but for a client with her diligence and

20   standing, we wouldn't be able to prosecute most, if

21   not all, the claims here.

22             THE COURT:  Well, I mean this is a

23   fairly modest request, Mr. Weiser, and I'm going to

24   grant it, but you're telling me what, that Miss

1   Gregory was a very active client who dealt with you
2   and helped you with the case, because at another
3   point, you said that she really wasn't involved,
4   wasn't deposed.
5                   MR. WEISER:  No, no.  I was just
6   trying to -- I apologize if I sent a mixed message
7   here.  No; she was involved with the case.  I was
8   trying not to oversell her participation in the case.
9   For example, there are certainly cases, and Your Honor
10  is aware of them, where the plaintiff spends scores of
11  hours prosecuting the case.
12                  THE COURT:  Right.
13                  MR. WEISER:  I just wanted to suggest
14  that while she was involved, and she was communicative
15  and engaged, she did not go to those -- she did not
16  make those types of efforts just because they weren't
17  required of her.  If anything, I was trying to suggest
18  that while we believe she added value to this
19  enterprise, I didn't want to oversell her
20  participation.
21                  THE COURT:  All right.  I get it.
22                  Another technical point, the $2500
23  comes out of your fee.
24                  MR. WEISER:  Yes, Your Honor.

24

1          THE COURT:  I don't have any other

2   questions for you, Mr. Weiser, unless you have

3   something else you want to tell me.

4          MR. WEISER:  No, I don't believe so.

5          MR. MONHAIT:  Your Honor, one point of

6   clarification, if I may.  When Mr. Weiser was speaking

7   about attorney hours, I didn't focus on it at the

8   time, but I think the number he gave you was hours

9   without the contract attorney time.  The number in the

10  brief at page 42, if my memory is correct, does

11  include the contract attorney time.

12         THE COURT:  It does.  It's 1580 in

13  your brief.

14         MR. WEISER:  I thought we had pulled

15  it out.  Okay.  I apologize.

16         THE COURT:  That's okay.  I think I

17  realized when you said that that what I was reading in

18  the brief probably did reflect those hours by the

19  temps.

20         MR. WEISER:  Okay.

21         THE COURT:  Which, unfortunately, at

22  this time, I suspect there's a lot of attorneys that

23  fall into that category.

24         MR. WEISER:  Well, that's one thing

1   that's interesting, Your Honor, is that the quality of

2   these temp attorneys that you can retain these days is

3   quite different than it was a few years ago.

4                   THE COURT:  I'm sure of that.

5                   Thank you very much, Mr. Weiser.

6                   Mr. Monhait, I don't know if you had

7   anything else you wanted to say.

8                   MR. MONHAIT:  I just wanted to make

9   that clarification, Your Honor; thank you.

10                  THE COURT:  Does Mr. Coll or anyone

11  else who is on the line want to speak or add anything?

12                  MR. BEYER:  Your Honor, this is Tim

13  Beyer.  I represent the defendants other than the

14  nominal defendant and other than Ken Tuchman, and I

15  don't really have anything to add, although I am

16  prepared to answer any questions that the Court might

17  have relating to any of the facts or legal issues in

18  the case.

19                  THE COURT:  Thank you very much for

20  that offer, Mr. Beyer, but having read the brief and

21  being pretty familiar with this type of litigation, I

22  don't see anything that jumps out at me.  I don't

23  think I'm going to need to trouble you.

24                  Anyone else?

1          MR. COLL:  Geoff Coll on behalf of the

2  nominal defendants, but we are also happy to rest on

3  the submissions.

4          THE COURT:  All right.

5          Well, counsel, thank you very much for

6  being available on by telephone.  This, I know, is

7  convenient for you, but it also is convenient to the

8  Court to do it this way.

9          I have read the brief that was

10 submitted and the affidavits, of course, by Mr. Weiser

11 and his firm and Mr. Monhait's firm and the others, so

12 I am familiar with the issues and with the terms of

13 the settlement.

14         Let me say at the outset that it is

15 comforting to know that this litigation was mediated

16 and that Judge Weinstein was involved in that.  That

17 is something that I do recognize and get comfort from.

18         Secondly, I have to tell you, having

19 had a number of options dating, backdating and excess

20 grant cases in my career, I think I am the only judge

21 perhaps on this Court who can say this, but I think

22 every one of my cases has successfully settled in a

23 way that has resulted in very generous settlements

24 that were highly beneficial to the companies involved

1  and to their stockholders.

2           So I take some, I don't know, personal

3  pride in that I am glad that that has worked out in

4  each of these cases, and this one in particular, as

5  well as the Ryan versus Gifford involving Maxim.  I am

6  happy about that and glad that you were able to

7  achieve this result, and I compliment all counsel

8  involved, those who represent the company and

9  represent the individual defendants as well as counsel

10 for the plaintiffs.

11          So having said that, let me turn then

12 to what I think I am obliged to do at this point.

13 First, a Court, in reviewing the proposed settlement

14 of a derivative litigation, looks primarily at whether

15 the settlement is fair, reasonable and adequate.

16 There is no real litmus test or a blueprint for how

17 courts arrive at what is a fair, reasonable and

18 adequate settlement, but we tend to focus on a number

19 of different factors which include the risks of

20 establishing liability in the litigation and the risks

21 of recovering or establishing any damages as a result

22 of any liability that is found.

23          In this particular case, Mr. Weiser

24 talked about the damages issue at length, and I don't

1    need to expand on that.  I think there were going to

2    be some significant hurdles for the plaintiff to

3    overcome in a case like this, given the fact that many

4    of the options were already under water, and many

5    others, or most, were not even exercised.

6               It may well have been, as Mr. Weiser

7    says, an excess grant case and boiled down to that

8    involving similar issues to Sanders versus Wang.  But

9    needless to say, given those risks, I think this

10   settlement and the terms of it are very reasonable and

11   fair and adequate.

12              When I add to that the additional

13   factors of the complexity of this litigation, the fact

14   that it might have taken weeks to try it, and there

15   might have been appellate practice involved, and

16   whatever decision was achieved here being challenged

17   in the Supreme Court, and the months if not years that

18   all of that would have taken, and really the type of

19   trial that it would have been, which largely would

20   have been a battle of the expert witnesses, which is

21   not unaccustomed in this court, but nevertheless is a

22   significant gamble in terms of how it is going to turn

23   out, I think it is a gamble on all sides, frankly;

24   both defense side and the plaintiff's side.

1              Also, the fact that no shareholders,

2    despite being given notice of this settlement, have

3    voiced any objection to it is another factor.

4              Finally, the views of counsel with

5    respect to the settlement are also sometimes taken

6    into consideration, and, in fact, are here.

7              So for all those reasons, I am

8    satisfied that this settlement is fair, reasonable and

9    adequate, and, therefore, should be approved, and I

10   will approve it.

11             That leaves only the fee award

12   application, and there may be, as Mr. Weiser says,

13   sort of a developed body of law with respect to fee

14   applications in options backdating or excess grant

15   cases.  If so, I am happy to hear that.  I am not

16   altogether aware of it, but nevertheless, anything

17   that will add clarity to a fee application process I

18   am all in favor of.

19             But not being aware of it, I am just

20   going to go by the litmus test that we apply in

21   Chancery, which is the famous Sugarland case where the

22   Supreme Court identified a number of factors.

23   Mr. Weiser mentioned them.

24             Predominant among them is the benefit

30

1  that the litigation achieved for the company and its

2  shareholders, and, here, I think, that makes it very

3  easy for me to agree with the fee application.  The

4  benefit here is an actual number.  Six and a half

5  million dollars I think is the number that's actually

6  a cash achievement for the company.

7              That is a clear benefit and a

8  measurable benefit, even putting aside all the

9  corporate governance and internal control benefits of

10  this settlement which I don't diminish in any way.  I

11  think they are, in themselves, quite significant and

12  add a substantial amount of benefit to this settlement

13  for the shareholders and for the company going

14  forward.

15              But given those factors and the

16  contingent nature of the fee, and the difficulty and

17  complexity of the litigation, as short lived as it was

18  by comparison to some cases perhaps, and of course,

19  the standing and ability of counsel on both sides of

20  this equation, both on plaintiff's and defense side of

21  the equation, all of those factors make it quite easy

22  for me to agree with Mr. Weiser that this is a very

23  fair and reasonable fee, and I will approve the full

24  amount of the fee, the 1.5 million as well as the

1    individual application for a $2500 payment from that

2    fee for the plaintiff, Susan Gregory.

3                   I think that is all that I need to do,

4    counsel, but if I have overlooked anything, or if I

5    have raised a question about something I have said,

6    please tell me now.

7                   MR. WEISER:  I don't think so.  I

8    think we already submitted a proposed order for Your

9    Honor's consideration.

10                   MR. MONHAIT:  Well, there was one

11   attached to the settlement agreement, but I think

12   Mr. Czeschin has one with some blanks filled in about

13   when the notice was mailed and so forth and is

14   prepared to submit that, and I think electronically

15   would probably be easiest for you, Your Honor.

16                   THE COURT:  Yes, Mr. Czeschin, if you

17   can do that, I will immediately execute that order and

18   grant it, and unless Mr. Weiser or Mr. Monhait or

19   someone else wants an actual hard copy signed sent to

20   them or faxed to them, I will simply execute it

21   electronically.

22                   MR. MONHAIT:  Electronic execution is

23   fine with me, Your Honor; thank you.

24                   MR. CZESCHIN:  We'll file the order

32

1   shortly.

2                THE COURT:  Thank you, Mr. Czeschin.

3   Everyone, have a very good day.

4

5

6                (The teleconference concluded at

7   3:20 p.m.)

8

9                          -----

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CERTIFICATE


          I, MAUREEN M. McCAFFERY, Official Court
Reporter of the Chancery Court, State of Delaware, do
hereby certify that the foregoing pages numbered
3 through 32 contain a true and correct transcription
of the proceedings as stenographically reported by
me at the hearing in the above cause before the
Chancellor of the State of Delaware, on the date
therein indicated.

          IN WITNESS WHEREOF, I have
hereunto set my hand at Dover, this 8th day of
January, 2010.




                    /s/Maureen M. McCaffery
                    ----------------------------
                     Maureen M. McCaffery
                     Official Court Reporter
                      of the Chancery Court
                       State of Delaware



Certification Number: 201-RPR
Expiration:  1/31/11

# EXHIBIT 3

**DECLARATION OF ROBERT BERG IN SUPPORT OF BERG'S MOTION TO
CONSOLIDATE RELATED ACTIONS AND APPOINT LEAD COUNSEL**

I, Robert Berg, being duly sworn on oath, depose and state:

1.      My name is Robert Berg.  I submit this declaration in connection with the shareholder derivative action asserted on behalf of Intuitive Surgical, Inc. ("Intuitive" or the "Company"), captioned *Berg v. Guthart, et al.,* Case No. 5:14-CV-00515-EJD, pending in the U.S. District Court for the Northern District of California (the "Action").

2.      I am a current shareholder of Intuitive and have continuously held my shares since January 2009.

3.      I have conferred with my counsel regarding the Action.  I understand that because I am acting on behalf of the Company in the Action, I have fiduciary duties with respect to the Company.

4.      I am interested in the Action because I want to help protect the long-term value of the Company for the benefit of its stockholders and because I want to ensure that Intuitive is not harmed, damaged, or penalized any further as a result of the defendants' conduct alleged in the Action.  I am also interested in the Action because I want the individuals at Intuitive responsible for causing harm to the Company to be held accountable for their actions.

5.      I fully appreciate and am aware of the duties and responsibilities I will undertake if the Court selects me and/or my counsel to serve as Lead Plaintiff and/or Lead Counsel in the Action, respectively.  I understand that, among other things, I will be required to: (a) retain my Intuitive shares throughout the duration of the Action; (b) devote the time necessary to closely supervise and monitor the developments in the Action and the work of my chosen counsel; and (c) place the Company's best interests

ahead of my own personal interests at all times.  I would assume these duties willingly
and without reservation.

6.      I declare under penalty of perjury that the foregoing is true and correct to
the best of my knowledge and ability.

Executed on April 21, 2014

_____
ROBERT BERG

1

**ATTESTATION**

2        I, Kathleen A. Herkenhoff, am the ECF User whose identification and password are being

3  used to file the Declaration of Brett D. Stecker In Support of Plaintiff Robert Berg's Motion to

4  Consolidate Related Actions and Appoint Lead Counsel.  In compliance, I hereby attest that Brett D.

5  Stecker has concurred in this filing.

6

7  DATED:  April 25, 2014           THE WEISER LAW FIRM, P.C.

8

9                                     s/ Kathleen A. Herkenhoff

10                                   Kathleen A. Herkenhoff

11                           Counsel for Plaintiff Robert Berg and
[Proposed] Lead Counsel

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on April 25, 2014, I authorized the electronic filing of the foregoing with

3

the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4

e-mail addresses denoted on the attached Electronic Mail Notice List.

5

I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.  Executed on April 25, 2014.

7

 s/ KATHLEEN A. HERKENHOFF
KATHLEEN A. HERKENHOFF

8

9

THE WEISER LAW FIRM, P.C.
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile: 858/794-1450

10

11

Email: kah@weiserlawfirm.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:14-cv-00515-EJD Berg v. Guthart et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael D. Celio**
  mdc@kvn.com,gpeterson@kvn.com,efiling@kvn.com

- **Jeffrey Joseph Ciarlanto**
  jjc@weiserlawfirm.com

- **Jo W. Golub**
  jgolub@kvn.com,efiling@kvn.com,SHarmison@kvn.com,sgiminez@kvn.com,jah@kvn.com

- **Cody Shawn Harris**
  charris@kvn.com,jsmith@kvn.com,efiling@kvn.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com,jmf@weiserlawfirm.com,hl@weiserlawfirm.com

- **Walter W. Noss**
  wnoss@scott-scott.com,efile@scott-scott.com

- **Brett D. Stecker**
  bds@weiserlawfirm.com

- **Philip James Tassin**
  ptassin@kvn.com,efiling@kvn.com,sharmison@kvn.com,sgiminez@kvn.com

- **Robert Brian Weiser**
  rw@weiserlawfirm.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)